DONALDSON et al. v. HENNING (STEVENS et al., Interveners).

(Fourth Division. Fairbanks. April 7, 1913.)

Nos. 1639, 1647, 1655, 1760.

1. MINES AND MINERALS (§ 112*)—LIEN FOR LABOR.

Where the work and labor performed by a miner in sinking the shaft, running tunnels, and developing the mine prior to the time a dump was actually piled on the surface contributed towards producing the dump, the claim of the lienor under the

---

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

special lien law in Alaska will be allowed in full as against the dump.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 233–235; Dec. Dig. § 112.*]

2. MINES AND MINERALS (§ 112*)—LIEN—NONLIENABLE ITEMS.

A lienor filed a notice of lien claiming a contract for different periods at different rates, but the testimony showed that one period at the increased rate included the use of a boiler, a nonlienable item. The evidence did not show exactly the number of days that he worked at either rate. *Held*, the statute gives a lien for labor alone, and clearly no lien could be had for the amounts due for the use of the boiler or for the cable. Neither the notice of the lien nor the evidence given upon the trial was sufficient to sustain a lien upon the property, and the claim must be disallowed.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 233–235; Dec. Dig. § 112.*]

3. MINES AND MINERALS (§ 116*)—LIEN FOR LABOR—PREFERENCE OVER DEED.

The parties entered into a lease dated June 2, 1910, whereby interveners reserved a royalty of 25 per cent. of all the gold to be thereafter extracted by the lessee from their placer mining claim. Thereafter, on June 25, 1910, Congress passed a mechanic's lien law specially applicable to Alaska, wherein the lien created thereby was given a preference over any mortgage, etc., but it was not to apply to any such "conveyance or other claim given in good faith and for value prior to the approval of this act" (Act June 25, 1910, c. 422, 36 Stat. 848). *Held*, the preference did not apply to the interest of the interveners fixed by the prior contract of lease.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 238; Dec. Dig. § 116.*]

4. CONSTITUTIONAL LAW (§§ 251, 300*)—DUE PROCESS—LIENS.·

The provision of the Constitution guaranteeing that property shall not be taken without due process of law is binding upon the Congress, and it is without authority to pass any law which would have such effect. To extend the provisions of the act of June 25, 1910, to give preference to claims for labor performed under a contract made since the enactment over rights secured and fixed by a contract made prior to that date would be taking the property of one person by legislative enactment and appropriating it to the payment of the debts of others. This is not due process of law.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 726, 727, 732, 940; Dec. Dig. §§ 251, 300.*]

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

5. MINES AND MINERALS (§ 114*)—NOTICE OF LIENS—LIBERAL CON-
   STRUCTION OF STATUTE.

 While the notices and pleadings to claim and foreclose a
miner's lien under the act of June 25, 1910, should be liberally
construed to carry out the purposes of the act, and to secure
the preference to laborers of a lien upon all dumps produced by
their labor, still a reasonable compliance with the terms of the
act is necessary, and the notices must be such as to inform any
one interested of the extent of the lien claim and of the prop-
erty upon which it is claimed.

 [Ed. Note.—For other cases, see Mines and Minerals, Cent.
Dig. § 236; Dec. Dig. § 114.*]

6. MINES AND MINERALS (§ 117*)—LIENS—AMENDMENTS—PLEADINGS.

 In foreclosing miner's liens under the act of June 25, 1910,
amendments to notices and pleadings cannot be allowed which
will cut out intervening rights or defeat the rights of those who
have incurred expense or who have pursued a course of action
relying reasonably and in good faith upon such information as
was imparted by the notices.

 [Ed. Note.—For other cases, see Mines and Minerals, Cent.
Dig. § 239; Dec. Dig. § 117.*]

The above-entitled actions, which were consolidated for pur-
poses of trial, were to foreclose separate liens for labor claim-
ed upon a dump or mass of mineral-bearing sands, gravels,
earth, and the minerals therein, on the upper part of the Wild
Goose Association placer claim on Engineer creek, in the Fair-
banks precinct.

On February 15, 1911, R. Donaldson, claiming a lien for
labor performed by himself, and as the assignee of five oth-
ers, began an action against H. M. Henning, defendant, in the
justice court for the Fairbanks precinct, to recover the amounts
claimed in the various lien notices theretofore recorded by
him and his assignees in the recorder's office of that precinct.
On the same day a separate action was begun in the same
court, against the same defendant, by John Dunn, claiming a
lien for labor performed by himself and as the assignee of
three others, to recover the amounts specified in the notices of
lien recorded by him and his assignees; and on March 6, 1911,
in the same court, George Naito began an action against said
Henning and R. J. Geis, Charles Thompson, and Morton E.

Stevens, to recover against the defendants the amount claimed in the notice of lien theretofore recorded by him in the recorder's office of the same precinct. Geis, Thompson, and Stevens were allowed to intervene in the first two actions, and the three actions were consolidated and tried together; and on April 19, 1911, judgment was given adjudging that the several plaintiffs had valid liens upon said dump for labor performed, for the various amounts specified in said notices of liens, and costs, and that they recover said sums from the defendant Henning, and further adjudging and decreeing that the interest of Stevens, Geis, and Thompson was inferior and subject to the liens of the plaintiffs, and further ordering that the United States marshal for this division wash up the said dump and extract the gold and gold dust therefrom and return the same into said court.

On May 16, 1911, the said R. Donaldson commenced an action in the same court against the said Henning as defendant, to recover against him the amounts specified in seven other notices of lien theretofore filed in said recorder's office against the same dump. Geis, Thompson, and Stevens also intervened in this action, and subsequently, on May 26, 1911, judgment was given in favor of the plaintiff for the amounts specified in the various notices of liens and for costs, and also adjudging that the interest of Geis, Thompson, and Stevens was inferior and subject to the said liens, and further ordering that the United States marshal for this division wash up said dump and return the gold and gold dust into said court.

From each of these judgments an appeal was taken by said Geis, Thompson, and Stevens to the district court.

On June 14, 1911, James McGrath and five others commenced an action in this court, to foreclose certain liens claimed by them upon the dump upon the same premises. In this action, as in those in the commissioner's court, no formal complaint was filed, but in lieu thereof the plaintiffs filed copies of the notices of liens recorded by them in the recorder's office as the statement of their claim, under the provisions of the act of June 25, 1910. The same defendants are not named in all these notices, but Charles Thompson, Al. Morency, Jane

Johnson, Peter Vidovich, Louis Bailard, Robert J. Geis, Morton E. Stevens, C. P. Pedersen, and Ed. McArdle appeared as defendants, and together filed an answer, and a separate answer was filed by H. M. Henning. Subsequently James A. McMullen, by leave of court, filed an answer and complaint in intervention, and from an order of court made April 6, 1912, it appears that the attention of the court was called to all these actions in open court by the respective attorneys, and it appearing that the object of all of said actions was the foreclosure of several liens claimed upon the same dumps, and the court being of the opinion that said actions should be consolidated, and no objection being made thereto, it was ordered that all of said actions be consolidated for purposes of trial and determination. The trial of all of the actions so consolidated was had before the court, beginning March 24, 1913.

It appears from the pleadings and the evidence that Vidovich, Pedersen, Morency, Geis, Johnson, Stevens, Bailard, Thompson, and McArdle are the owners of the Wild Goose Association placer claim, and that on June 2, 1910, they leased the upper thousand feet of this claim to Henning for a term beginning on that date, and continuing for a period necessary to prospect, mine, and work out the ground, unless sooner declared forfeited on account of the violation of any of certain agreements contained in the lease, Henning agreeing, among other things, to enter upon the premises before June 20, 1910, and to begin work by sinking a shaft to bedrock, and to work the ground continuously until mined out, to pay and deliver to the owners 25 per cent., or one-fourth, of the gross product of gold or other precious metals mined from the said premises, he to retain 75 per cent., or three-fourths, of such product, and to pay all operating and other expenses of every nature, and to protect said premises from any lien or incumbrance of any nature; that Henning began the sinking of a shaft some time prior to June 20, 1911, and in September began sluicing the gravel hoisted through this shaft, and continued such hoisting and sluicing until about February 10, 1911; that all the ground mined and hoisted during this time was washed and sluiced, except a small dump formed at vari-

ous times by depositing near the shaft gravel and earth which, for various reasons, could not be washed as hoisted. The various lien claimants were employed by Henning, and performed labor under their agreements with him for various periods from the time he first began operations until he ceased working in February, and all had received payment in part for such services, but had not been paid in full. The first of the lien claims was recorded about February 3, 1911, and within a few days thereafter Henning stopped mining, being unable to obtain credit to operate longer, as he claims, on account of these liens being recorded. In addition to the dump of unwashed gravel just mentioned, it appears that there is a much larger pile or dump of tailings from the ground which was sluiced or washed, and which it is contended contains a considerable amount of gold and gold dust which was not extracted by the sluicing operations. The allegations concerning the dump are practically the same in all the recorded notices of lien, and claim a lien upon that certain dump or mass of mineral-bearing sands, rock, earth, and gravels situate on the upper 1,000 feet of the Wild Goose Association claim. In the action of McGrath and others, by leave of court these allegations were amended to claim a lien upon "those certain dumps," and in the other actions, while pending upon appeal in this court, and before trial, amendments were allowed so as to allege a claim of lien upon "those certain dumps and pile of tailings" upon said premises.

On April 14, 1911, the owners of the claim served notice upon Henning, declaring the lease forfeited by reason of his failure to comply with certain agreements therein contained, and it is not disputed that the forfeiture was rightfully declared, except that Henning claims the right to wash and sluice the pile of tailings under a provision in the lease allowing him "the right to wash up or sluice any and all auriferous gravel contained in any dump upon said ground" at the time of forfeiture, "provided further, that the same shall be washed or sluiced within thirty days from the time sufficient water therefor can be obtained." After the declaration of forfeiture, the owners of the ground entered into an agreement with the in-

tervener McMullen, bearing date May 12, 1911, whereby Mc-Mullen was given the right to sluice and wash up this pile of tailings; he agreeing to pay the owners 25 per cent. of the gold extracted therefrom. It appeared also that McMullen began operations under this agreement about the date of its execution, and worked for about a month, until notices of the commencement of the action of McGrath and others were posted upon the pile of tailings by the marshal, whereupon he immediately ceased work; that during the time he was working he made two clean-ups, one of 8 and one of 16 ounces of gold, of which he paid one-fourth to the owners of the claim according to his agreement. It appears that the marshal did not take any steps to wash up said dump, pursuant to either of the judgments rendered in the commissioner's court, but that on April 15, 1912, an order was made by the district court appointing Duncan McPhee a special officer of the court to supervise the washing up and sluicing of the dumps or masses of mineral-bearing earth, rock, sands, and gravels upon the surface of the upper 300 feet of the Wild Goose Association placer mining claim, and to return the gold and gold dust therefrom, as washed up, into court. No return of his operations under this order appears to have been made by McPhee, but it appears from the files and records of the court that he returned into court gold dust of the value of $5,919.71, of which was paid out for wages, costs, and expenses under orders of the court $3,101.74, and that there is now in the hands of the clerk of the court a balance of $2,717.97. It appeared from the testimony that the dump washed by McPhee was the one known as the "small dump" of unwashed earth and gravel, and that he did no work in washing or sluicing the dump or pile of tailings. On May 23, 1913, an order of court was made, authorizing and directing the intervener McMullen to wash up the pile of tailings, and to deliver the gold extracted therefrom to the clerk of this court until gold of the value of $1,800 should have been so deposited. It does not appear that any gold was extracted by him, or deposited with the clerk of the court, pursuant to this order.

A. R. Heilig and B. A. Dodge, both of Fairbanks, for plaintiffs.

J. K. Brown, of Fairbanks, for defendant Henning.

M. E. Stevens, of Fairbanks, and R. F. Roth, for Interveners.

FULLER, District Judge. The first contention of the defendants is that the lien claimants are at most entitled to a lien only upon the small dump of unwashed gravel, and upon that only to the extent of the amount of their labor for the time actually taken to hoist this dump, and that, at most, this cannot be more than two or three days for any of the claimants. It is further contended that as the evidence does not show, on the part of any claimant, the actual time he was employed while this dump was being hoisted and placed on the surface, there is no evidence to show the amount in which any claimant is entitled to a lien, and that the evidence therefore is altogether insufficient to sustain the actions. It is also contended that, as far as the dump of tailings is concerned, no reference is made to it in any of the recorded claims of lien, and that, by reason of such omission, no lien was ever acquired thereon; also that inasmuch as no notice of the commencement of the actions in the commissioner's court was posted upon the pile of tailings, even if the statement in the notices could be construed to include such tailings, the court is without power to adjudge that a lien exists upon them.

While the evidence undoubtedly shows that the small dump of unwashed ground was the result of only a few days' labor, and that the greater part of it accumulated during a few days while the machinery was broken down and sluicing could not be carried on, it also appears that some gravel was placed upon this dump at various times during all the period that Henning was operating, and it seems that it should be considered as the result of all the work done under his lease, and of the labor performed by all the claimants, rather than as the result of the labor during the hours that gravel was actually being dumped thereon. The labor performed in sinking the

shaft, running tunnels, and developing the mine prior to the time the dump was actually being piled up contributed more or less towards producing this dump, and the object of the act seems to be to give to each one performing labor upon the mine, while the mine is being developed and operated, a lien upon the dump produced. In this case it would be impossible to segregate the labor directly expended in excavating, hoisting, and piling the ground in this dump from the labor performed in and about the mine during all the time mining operations were carried on by the claimants. So to restrict the terms of the act will either defeat its purpose altogether, or limit its benefits to the few who could prove that the dump was the direct product of their labor, whereas the labor of these same men at other times, or of their coemployés, was as necessary, and tended as directly to the production of such dump, as the labor actually performed in piling the gravel thereon. It follows, therefore, that each of the claimants was entitled to a lien upon this dump for the balance due him for the labor performed in and about the mine. The evidence shows that the amounts for which they were entitled to a lien were as found by the commissioner's court, except in the case of Fred Irving, in which the amount should be $167.50, instead of $67.50, with a corresponding increase in the allowance for attorney's fees, and in the case of the individual claim of John Dunn. The statement in Dunn's notice of lien is as follows:

"That H. M. Henning & Co. employed claimant to perform such work and labor upon the following terms and conditions: That the claimant was to receive the sum of $8 per day for part of said services, and the sum of $10.50 per day for the remainder of said services. That said contract has been faithfully performed and fully complied with on the part of the claimant, who performed labor thereunder aforesaid for the period of 37 days. That said labor was performed between the 13th day of December, 1910, and the 19th day of January, 1911, and the rendition of said services was closed on the 19th day of January, 1911, and 90 days have not elapsed since that time. That the amount of claimant's demand for said services is $363.50. That no part thereof has been paid except the sum of $10, and there is now due and remaining unpaid thereon, after deducting all just credits and offsets, the sum of $353.50, in which amount he claims a lien upon said property."

The evidence was that Dunn was employed and worked for a certain number of days at $8 a day; that he then made an agreement with Henning by which he was to receive $10.50 a day for his services and the use of a boiler. The evidence did not show exactly the number of days that he worked at either rate. It also appeared that he sold a cable to Henning, the exact price of which did not appear, and that the amount of $363.50, stated as the amount of his demand, was made up of these three different items. Evidently no attempt is made to segregate these items in the notice of lien, and the evidence itself does not show with any certainty the amount due for the different items. The statute gives a lien for labor alone, and clearly no lien could be had for the amounts due for the use of the boiler or for the cable. It may be that the intention of the parties was to allow $2.50 a day for the use of the boiler, and $8 a day for the services of the claimant; but this is not the agreement testified to by the claimant, and it is not competent for the court to make a new contract, separating the items, in order that the claimant may have an agreement entitling him to a lien.

"The rule seems to be that where lienable and nonlienable items are included in one contract for a specific sum, or are made the basis of a lump charge, so that it cannot be perceived, from the contract or account, what proportion is chargeable to each, the benefit of the Mechanic's Lien Law is lost. In such case the court cannot, by extrinsic evidence, apportion the amount of the entire charge or contract price between the lienable and nonlienable items; but where the claimant's demand, made in good faith, consists of several different items separately charged, some of which are by law a lien upon the property, and others do not come within the scope of the statute, he may enforce his lien so far as given by law, and it is not vitiated because he has included therein nonlienable items." Allen v. Elwert, 29 Or. 428, 44 Pac. 823, 48 Pac. 54; Williams v. Toledo Coal Co., 25 Or. 426, 36 Pac. 159, 42 Am. St. Rep. 799; Harrisburg Lumber Co. v. Washburn, 29 Or. 150, 44 Pac. 390; Kezartee v. Marks, 15 Or. 529, 16 Pac. 407; 27 Cyc. 204, 777.

Neither the notice of lien nor the evidence given upon the trial was sufficient to sustain a lien upon the property, and the claim of the claimant Dunn must therefore be disallowed.

The next contention of the owners of the mining claim is that although the claimants may have valid liens upon the

dump, so far as the interest of Henning therein is concerned, these liens cannot bind the interest of the owners, inasmuch as their right to one-fourth of the gold in the dump was fixed by the terms of the lease made between them and Henning on the 2d day of June, 1910, and prior to the date of the act giving a lien for labor upon dumps of gold-bearing gravel produced from placer mining claims. This act was approved and went into effect June 25, 1910. Prior to that time the only right a laborer had to a lien for work done upon a placer claim was a right to a lien upon the claim or mine itself for labor performed in the improvement or development of the mine. Pioneer Mining Co. v. Delamotte, 185 Fed. 752, 108 C. C. A. 90; Andrews v. Ladd, 188 Fed. 313, 110 C. C. A. 291.

Where the labor was performed for others than the owner, and not for the owner directly, the owner could prevent the attachment of the lien upon his property by posting proper notice thereon within three days after the beginning of the performance of the labor. If such notice were posted where a mine was worked under a lease, as in the present cases, only the interest of the lessee therein would be subject to the lien, and the interest of the owners would be exempt. The act of June 25, 1910, under which the present liens are claimed, contains no such provision, but the entire dump extracted from a mining claim, and all interests therein, are subjected, without reservation, to a lien for the labor performed in producing the dump. The act provides:

"The said lien shall be prior to and preferred over any deed, mortgage, bill of sale, attachment, conveyance, or other claim, whether the same was made or given prior to such labor or not; Provided, that this preference shall not apply to any such deed, mortgage, bill of sale, attachment, conveyance, or other claim given in good faith and for value prior to the approval of this act."

To prefer the liens claimed herein to the claim of the owners evidently would not give a preference over any deed, mortgage, bill of sale, attachment, or conveyance, but it would give a preference over a claim of the owners to an interest in the dump. Such claim is fixed and given by the lease executed June 2, 1910, 23 days prior to the date of the approval of the act. That the lease was entered into in good faith is not dis-

puted. Also, evidently, there was a valuable consideration for this claim of the owners. By the terms of the lease Henning agreed to mine the ground, and to pay and deliver to the owners one-fourth part of the gold extracted from the ground, and thereby one-fourth part of the product of the mine was reserved to the owners, and they were thereby "given a claim" against the dump thereafter produced, and a right to part of the gold therein. The consideration for this claim given, or interest reserved, was the grant by the owners to the lessee of the right and privilege to mine the ground and to retain three fourths of the output, and the agreement by the lessee to mine the ground and to deliver to the owners the other fourth part of the output. This is a right on the part of the owners, fixed by the agreement made before the act went into effect, which a proviso in the act excludes from its operation, and to which the preference given to claims for labor does not apply. Even if this proviso were not contained in the act, Congress would be without authority to enact a law making void a legal contract and appropriating the property of one person to pay the debt of another. The contract between the owners and the lessee was made with reference to the law as it stood at the time the lease was executed, and such law was as much a part of the contract as the express written terms thereof. As stated, under the law as it then stood, the owners could maintain their property clear from liens for labor contracted for by the lessee, by giving proper notice. Under the act of June 25, 1910, such right on the part of the owners does not exist. In a lease executed since that date, an owner must contract with reference to the liability imposed by the law, and is presumed to have knowledge of it and to govern himself accordingly in such contracts as he may choose to make. To apply these provisions to a contract made before that date would be to extend the liability to an owner that he did not agree to assume, and from which he had no opportunity to shield himself when making the contract. The Constitution of the United States, and the rights guaranteed thereby, have been extended to the territory of Alaska and its citizens, and though the prohibition against passing any law impairing the

obligation of a contract extends only to the Legislatures of the several states, and is not by its terms binding upon the Congress, such provision embodies one of the fundamental principles of natural justice, and no act of Congress should be construed so as to impair the obligation of a contract, if open to any other reasonable construction. The provision of the Constitution guaranteeing that property shall not be taken without due process of law is binding upon the Congress, and it is without authority to pass any law which would have such effect. To extend the provisions of the act of June 25, 1910, to give the preference to claims for labor performed under a contract made since the enactment, over rights secured and fixed by a contract made prior to that date, would be taking the property of one person by legislative enactment and appropriating it to the payment of the debts of others. This is not due process of law. It is unnecessary, however, to look to the provisions of the Constitution, or to consider how far Congress is limited thereby in legislating for the territory, because the act itself, in the proviso above quoted, clearly provides that the preference given to claims for labor does not apply to any claim or right in good faith and for value, given or fixed prior to the approval of the act. It follows, therefore, that the liens herein sought to be foreclosed are subsequent to the claim of the owners of the mining ground for one-fourth part of the gold contained in the dumps upon the ground.

It is alleged in the different answers of the owners of the mining claim, and in the answer and the complaint in intervention of McMullen, that all the rights of the lessee Henning had become forfeited by reason of his failure to comply with the agreements on his part to be performed, as set out in the lease. The decided weight of evidence seems to point to this conclusion, and to show that Henning's present claim to the right to wash up the tailings was an afterthought, and that he was led to this conclusion only after he found that some profit might result to McMullen from his (McMullen's) operations upon the abandoned tailing pile. It results from these considerations that Henning has no further right in the prem-

ises, and that McMullen's agreement with the owners should be upheld, and he be given the right to wash up and sluice the pile of tailings now on the ground, subject to whatever rights the claimants of labor liens have therein.

It is necessary, therefore, to consider whether or not any liens have been secured upon the pile of tailings, as distinguished from the liens upon the dump of unwashed gravel, or what was referred to in the trial as the "small dump." As before stated, the various notices of lien referred only to a "certain dump." To determine just what was meant by that term, resort must be had to the evidence of the actual conditions upon the ground, and what dump or dumps were there situated. It appears that the dump of unwashed earth and gravel was about 60 or 75 feet in diameter at the base, and some 12 or 15 feet in height, situated between the shaft and the gin pole used in hoisting from the shaft into a hopper; that the pile of tailings extended over a considerably larger space of ground, and on one side ran up to, and perhaps in places a short distance up, the sides of the smaller dump. It might be that the term "dump" would include both the smaller dump and pile of tailings, but it should also be considered that the terms "dump" and "tailing pile" are usually used by miners with different meanings, and that the term "dump" usually refers to the pile or mass of gold-bearing earth or gravel hoisted from a mine, prior to the time that it has been washed and the gold and gold dust extracted therefrom, and that the term "tailings" or "tailing pile" usually refers to the pile or mass of earth or gravel that has been washed or sluiced, and from which the gold and gold dust has been extracted. If the washing has been done under favorable conditions, in a minerlike manner, the tailings or tailing pile is without value. But conceding that, under the conditions shown to exist upon this mining claim, the tailing pile still contained a certain amount of gold, and was of considerable value, and might be included within the general term of "dump," it was necessary, in any action to foreclose laborers' liens, under the act above referred to, to post a notice of the suit upon the dump upon which the lien was claimed. The act provides as follows:

"The officer serving the summons shall also immediately post a copy of said lien notice in a conspicuous place on the dump or mass of mineral-bearing sands, gravels, earth or rock, and gold and gold dust and other minerals therein, upon which the lien is filed, and from the moment of posting the lien notices, the dump or mass of mineral bearing sands, gravels, earth and rock, and gold and gold dust and other minerals therein, shall be in the custody and under the control of the officer."

It appears from the evidence that the notices posted by the marshal in the various actions begun in the commissioner's court were posted upon the smaller dump, and in such a position as to indicate to the ordinary observer that a lien was claimed upon this smaller dump, and not upon the pile of tailings. The notices posted by the marshal in the action begun in the district court by McGrath and others were posted upon the pile of tailings, and in such a position as clearly to indicate that a lien was claimed thereby upon the pile of tailings. While the act expressly provides that no mistake, informality, or mere matter of form, or lack of statement either in the lien or notice or pleadings, shall be ground for dismissal or unnecessary delay in the action to foreclose the lien, but the lien notice and pleadings may be amended at any time before judgment, and while undoubtedly the notices and pleadings should be liberally construed to carry out the purposes of the act, and to secure the preference to laborers of a lien upon all dumps produced by their labor, still a reasonable compliance with the terms of the act is necessary, and the notices must be such as to inform any one interested of the extent of the lien claim and of the property upon which it is claimed. Amendments cannot be allowed which will cut out intervening rights, or defeat the rights of those who have incurred expense, or who have pursued a course of action, relying, reasonably and in good faith, upon such information as was imparted by the notices. The penalties prescribed by the act, upon any one interfering with the rights of a lien claimant, are severe; and it is only just that lien claimants be held to a reasonably strict compliance with the terms of the act in giving notice of their claims. If the different acts and proceedings of the different lien claimants in the actions in the commis-

sioner's court were sufficient to perfect liens upon the pile of tailings, then under the provisions of the law, when McMullen sluiced up and took away a part of the gold contained in this tailing pile, he became liable to all of the lienholders for the full amount of their judgments and costs, and also became guilty of a crime, and could be punished as for the crime of grand larceny. The right of amendment should not be extended so far as to accomplish such results. The acts of these claimants in posting notices of their liens upon the premises, taken in connection with the limited claim of lien in the original notices recorded, are not sufficient to give them a lien upon the pile of tailings. In the action begun by McGrath and others in the district court, however, the notices of lien were posted upon the pile of tailings, and in such a manner as undoubtedly did give notice to any one concerned of the claims of lien upon the pile of tailings as well as upon the adjoining smaller dump; and though it might possibly be inferred from the original notices recorded, and the subsequent acts of the parties, that the original intention was to claim a lien only upon the smaller dump, and that the intention to claim a lien upon the pile of tailings was formed only after it was known that McMullen had begun to sluice them, and their value thereby became probable, still there is no positive act of these claimants showing an intent not to claim a lien upon the tailing pile, and a reasonably liberal construction of their recorded notices, taken in connection with the notices posted, gives a lien to these claimants upon the pile of tailings.

Upon the argument at the conclusion of this case, the question was not considered whether or not the rights of the claimants in the different actions might not be different, but a consideration of all these cases seems to render necessary a determination of this matter. From the statement hereinabove made, it appears that several different actions were begun, at different times, by different persons claiming a lien upon the same property. The notices of lien seem all to have been recorded within the time required by law, and the various actions appear to have been begun thereafter within the time limited. In these respects the liens appear to be of equal rank.

4 A.R.—42

The defendants in the different actions, however, are not all the same. In some, Henning is named as the sole defendant; in others, part or all of the owners are joined as defendants with him. However, in all the actions the owners have appeared either as interveners or defendants, and there is no difficulty in determining their rights in the premises. The act under which the liens are claimed does not specify who shall be named as parties defendant, either in the notice of lien or in the action to foreclose the lien. It does provide, however, that all persons who claim any interest in the property, in opposition to the lien claimant, may come in and answer and set up and defend their claims. Under the general mechanics' or laborers' lien law, there is an express provision that, in any action to enforce any lien under that law, all persons personally liable, and all lienholders whose claims have been filed for record, shall, and all other persons interested in the matter in controversy, or in the property sought to be charged with a lien, may be made parties; but such as are not made parties shall not be bound by such proceedings. This, however, seems to be only a statement of the law as generally applicable to all actions. In any action, parties interested in the subject-matter, who are to be bound by the judgment, must be either actually or constructively before the court. While the act of June 25, 1910, does not specifically point out who shall be named as defendants, it does provide that every one interested shall have the right to appear in any action to foreclose a lien thereunder, and provides for a posting of notice upon the property, seemingly with the intention that such notice shall operate as process upon all parties concerned.

The action to foreclose the lien partakes somewhat of a proceeding in rem, and seems to contemplate that the notice posted on the ground shall be sufficient notice to all parties interested. If such is the purpose of the act, and if such posted notice can be held a sufficient notice to all parties in interest, then they are under obligation to appear in the foreclosure action and assert their rights therein, or such rights will be barred by the failure so to assert them. These actions seem to have been brought upon a different theory, without compliance with

either the general law concerning parties to an action, or the general mechanics' lien law, or the rule implied in the act of June 25, 1910. Each claimant, or at least each aggregation of claimants joining in each separate action, has proceeded without reference to the rights of the other lien claimants, and without any effort to bring such other claimants into the different actions. In the first three actions instituted in the justice's court, that court seems to have taken notice, of its own motion, of the fact that the actions concerned the same property, and to have consolidated them as provided by the act; and there could be no question that such action was proper, and that, so far as these different claimants were concerned, a proper judgment was rendered. Subsequently another action was begun, asserting liens of equal rank with those formerly adjudicated, and, without any reference to the prior adjudication, the court proceeded to render a judgment similar to that rendered in the former consolidated case, and again directed that the marshal wash up the same dump and return the proceeds into court. Subsequently the action of McGrath and others was begun in the district court to foreclose liens upon the same property involved in the prior actions in the justice's court, but none of these claimants is made a party, and judgment is sought against the same property without any reference to the prior adjudications thereon in the prior actions in the justice's court. That such separate proceedings would ordinarily result in trouble and confusion is evident. Since the cases from the justice's court have been appealed to the district court and consolidated with the action begun herein, conflicts of authority and confusion undoubtedly will be avoided in this particular case, but it does not seem that the order of consolidation has the effect of placing the lien claimants in the three different actions upon the same footing. This could only result from the proceedings had herein, if the suggestion for consolidation is to be construed as a stipulation on the part of the different claimants that their claims and rights are of equal rank, and are to be so considered in this consolidated action. The record itself does not show that such an effect can be given to the proceedings. If, as above suggest-

ed, the notice in the first action in the justice's court, posted upon the premises, was a sufficient notice to all parties concerned, and operated as process directed to them, then all the lien claimants should have appeared in that action, and have therein asserted their claims of lien; and, by their failure so to do, they are barred from asserting any rights as against the parties to that action, or at least their rights must be held as subsequent and inferior to the rights of the plaintiffs in that action. As these matters were not considered upon the trial, and as, in view of the limited amounts realized from washing the dump upon which a lien was first claimed, these matters are of vital importance in determining the rights of the plaintiffs in the different actions, the case has been set down for further argument thereon.

Under the statute, in any decree for foreclosing a lien thereunder, provision must be made either that the dump upon which the lien is foreclosed be sold or be washed up by the marshal or by some of the parties, and the proceeds returned into court for distribution to the parties entitled thereto; and, as no evidence was offered concerning the procedure that would be best for all parties concerned, this matter also has been set down for further argument.