Lillian SCHLOTHAN, Plaintiff, v. Sigmund EINSTOSS, and
The Territory of Alaska, Defendants.
No. A. 3412.

District Court, Alaska. First Division, Ketchikan.
June 21, 1957.

———◆———

Lester O. Gore, of Gore & Jernberg, Ketchikan, Alaska, and Phillip Barnett, of Barnett & Robertson, San Francisco, Cal., for plaintiff.

J. Gerald Williams, Atty. Gen., Territory of Alaska, by David J. Pree, Asst. Atty. Gen., for defendant Territory of Alaska.

KELLY, District Judge.

This is an action brought by the plaintiff to foreclose a purchase money mortgage given by the defendant Sigmund Einstoss to secure the payment of some $11,000 with interest, the unpaid remainder of a $25,000 note which was given in payment for certain tideland property in Ketchikan, Alaska. The defendant Territory of Alaska was joined in the complaint because of its claimed interest in the property by virtue of a Territorial tax lien, notice of which was recorded November 2, 1953, for taxes accruing in the years 1950 and 1951 in the total sum of $59,582.93 plus penalties and interest. The Territory filed a cross-claim against the defendant Einstoss for this sum and prayed for enforcement of its lien. On motion of the plaintiff, judgment was entered for foreclosure of the mortgage upon the pleadings. The order and judgment heretofore entered provided for a summary judgment on behalf of the defendant Territory of Alaska pursuant to Rule 56, Fed. Rules Civ.Proc., 28 U.S.C.A., against the defendant Sigmund Einstoss in the amount of $83,402.47, together with

6% interest on the sum of $59,582.93 from and after May 1, 1954. The judgment also provided that the Territory of Alaska have a lien upon all the property of Sigmund Einstoss wherever located. The judgment on the pleadings further provided as follows:

> " * * * That the Territory of Alaska has appeared in this action and claims a lien upon all of said described property and alleges its lien to be superior to plaintiff's lien; that this judgment does not attempt to decide whether the plaintiff's lien or the lien of the Territory is superior. That question is left for further action by this Court."

It is upon this question, left unsettled in the judgments and decrees heretofore entered, that this matter is now before this Court.

An order was entered on December 21, 1956, staying the enforcement of the judgment and decree until this question is disposed of, and providing, if a sale of the property by agreement between the parties was had, the proceeds therefrom would be deposited in the registry of the court.

On January 25, 1957, a stipulation of facts was filed and on January 29, 1957, an order was entered requiring the present occupants and users of the premises to pay the rent therefor to the Clerk of the District Court.

The Court requested briefs from the Attorney General, representing the Territory of Alaska, and granted permission to counsel for the plaintiff to file briefs upon this question.

The stipulation of facts reveals that prior to June 19, 1951, plaintiff was the owner of the tideland property and the improvements thereon, the subject matter of this litigation, and that at that time the property was owned by the plaintiff free and clear of any and all liens, mortgages, or deeds of trust. Prior to the date of sale of this property

it was used for the manufacture of wire netting by the Alaska Steel and Wire Company, which company was a corporation operated by plaintiff's husband, William Schlothan, for some 20 years. On or about January 27, 1951, the corporation was dissolved, the Alaska Steel and Wire Company having ceased operation of its wire netting manufacturing, and from the time of said dissolution until the sale of the property by the plaintiff it was used for storage and warehouse purposes only.

Early in 1951 the defendant, Sigmund Einstoss, approached the plaintiff and her attorney, Phillip Barnett, with the idea of purchasing the property and the improvements thereon for use as a storage and warehouse building. At that time defendant Einstoss was engaged in the fishing and canning business throughout Alaska, including the operation of a salmon cannery at the north end of the City of Ketchikan. This operation was conducted on property known as the Bertosen property and was known locally as the "Einstoss Cannery." Einstoss needed additional space for storage and warehouse purposes. As a result of long negotiations, on June 19, 1951, plaintiff executed a quitclaim deed to the property, taking back a purchase money mortgage as security for the payment of the balance due under the terms and conditions of sale. Plaintiff was aware of the cannery operation of Einstoss. At no time prior to the sale of the property in 1951 to Sigmund Einstoss did the defendant or anyone else use the property as a cannery.

Shortly after the acquisition of the Schlothan property by Einstoss he secured salmon cannery equipment and converted the use of the buildings thereon for cannery purposes and in fact canned salmon on the property during 1951 as well as using the property for storage and warehouse purposes.

Defendant Einstoss defaulted in the terms of his mortgage and on March 29, 1954, proceedings were instituted to foreclose the mortgage. Einstoss died and Mildred Hulce was appointed administratrix of his estate.

On November 2, 1953, the defendant Territory of Alaska filed a notice of tax lien in the Office of the Recorder for the Precinct of Ketchikan where this property is located. This notice of tax lien was against defendant Einstoss. At no time prior to November 2, 1953, was any actual notice of any kind or character ever given to the plaintiff of the existence of any lien or of any taxes due the Territory from Einstoss. The Territorial lien is based on the provisions of the commercial fisheries license tax provided for in Ch. 82, S.L.A.1949 as amended by Ch. 113, S.L.A.1951.

The stipulation of facts sets forth that the taxes owed by Einstoss were for operations in various parts of Alaska as follows:

| | |
|---|---:|
| Petersburg, Alaska, 1950 tax claimed | $ 3,018.40 |
| Ketchikan, Alaska, 1950 (not on property herein described but other parts of Ketchikan) | 10,833.13 |
| Other locations in Alaska, 1950 | 8,110.92 |
| Petersburg, Alaska, 1951 | 20,802.41 |
| Other parts of Alaska, including Ketchikan, 1951 | 16,818.07 |

What portion of the $16,818.07 is the result of the operation of the defendant Einstoss on the mortgaged property herein described is not revealed; nor was it shown what part, if any, of the above taxes for 1951 accrued after the Schlothan property was transferred on June 19, 1951, to the tax debtor, Einstoss. This, likewise, could be determined by the Territory from its records.

The general question here involved is the extent to which commercial fishery license taxes owing to the Territory by virtue of the statute can be given priority over a purchase money mortgage on property acquired by the tax debtor. The issues are threefold, based upon the different origins of the taxes involved:

> (1) Can the license taxes accruing from the canning operations at the property here involved be given priority over the purchase money mortgage?

> (2) Can the license taxes accruing after the acquisition of the property here involved from other different and separate canning operations be given priority over the purchase money mortgage?

> (3) Can license taxes accruing from other separate operations *before* the acquisition of the property here involved be given priority over the purchase money mortgage?

The Territory contends that each of these questions must be answered in the affirmative, based upon Sec. 4(h) of the Act:

> "(h) Liens. All taxes levied or provided or accruing under the provisions of this Act, and the penalties and interest thereon, are hereby declared to be a lien prior, paramount and superior to all other liens, mortgages, hypothecations, conveyances and assignments, upon all the real and personal property of the person, firm or corporation liable therefor, and also upon all the real and personal property used with the permission of the owner thereof in prosecuting the business; * * "

In support of their contentions, the defendant Territory of Alaska cites United States v. Snyder, 1893, 149 U.S. 210, 13 S.Ct. 846, 37 L.Ed. 705, and Territory of Alaska

v. The Artic Maid, D.C.Alaska 1956, 140 F.Supp. 190, the so-called "freezer-ship cases" decided by Judge Hodge, of this court, on March 14, 1956. However, the application of Sec. 4(h) in the "freezer-ship cases" was entirely different than in the present case. Judge Hodge determined that a fisheries license tax against the owner of a vessel became a first lien upon his property, and followed the vessel into the hands of a purchaser who had no actual knowledge of the encumbrance. In the present case, the tax is charged to the purchaser and not the seller. The Territory seeks to subordinate the seller's equity to the tax lien.

The Supreme Court held in the case of United States v. Snyder, supra, that a tax imposed by Congress is not subject to the recording laws of Louisiana.

As can readily be seen, these cases do not answer the troublesome problem here facing the Court.

With regard to the taxes accruing in 1950 and 1951, prior to the purchase of the Schlothan property by defendant Einstoss, the Territory contends that the lien upon "all the real and personal property of the person * * * liable therefor" would include this property and be a superior lien to the Schlothan mortgage. Obviously the taxes which accrued prior to the purchase of the property here involved were not a lien on Schlothan's property when they accrued, for Einstoss had not yet purchased the property. Could property purchased thereafter be made subject to the tax lien beyond the buyer's interest therein and superior to the purchase money mortgage? In the absence of specific wording in the act extending the lien to after-acquired property, it clearly could not.

Cooley, in his treatise, The Law of Taxation, Vol. 3, Sec. 1230 (4th ed. 1924), states the rule as follows:

"If, therefore, the statute in terms makes the tax a lien on one species of property, it will not by

intendment be extended to any other species. *And if in terms it makes the tax a lien on all property and rights of property of the person taxed, the lien will be limited to property and rights owned when the tax accrued."* (Emphasis supplied.)

Other authorities in accord with this statement are:

Libby, McNeill & Libby v. City of Yakutat, Alaska, 9 Cir., 1953, 206 F.2d 612; Yarbrough Bros., Hardware Co. v. Phillips, 1923, 209 Ala. 341, 96 So. 414; Board of Com'rs of Natrona County v. Shaffner, 1903, 12 Wyo. 177, 74 Pac. 88; Farm & Cattle Loan Co. v. Faulkner, 1926, 34 Wyo. 199, 242 P. 415; State v. Swensk, 1939, 161 Or. 281, 89 P.2d 587; 33 Am.Jur., Liens, Sec. 13, p. 425.

■ In the present case the lien is given priority over all other encumbrances upon all the real and personal property of the person, but there is no specific provision for a prior lien on after-acquired property. Accordingly, the Territory's lien for taxes accruing prior to the acquisition of the property from Schlothan is subject to the purchase money mortgage.

There is no doubt that the taxes which are allocable to the canning operations on the property in question may be made a first lien upon that property. The reason for such a rule was aptly stated in Thomas v. Jones, 1897, 94 Va. 756, 27 S.E. 813, 814:

"That taxes are prior in dignity to all other liens must be so from the very necessity of the case; otherwise the state would be powerless to collect her revenue. The liens upon land would, as in the case at bar, often be greater than the value of the land, and, the tax lien being inferior, the land would escape all taxation."

Likewise, the authorities agree that taxes may be declared a lien against all the owner's real and personal property, without giving priority, however, over encumbrances on the property other than that against which the tax is assessed. The rule is summarized in 3 Cooley, The Law of Taxation, Sec. 1236 (4th ed. 1924):

> "The rule in most of the states is that the lien on each tract of land is for the taxes against such tract only, but in some states the statute is found to go even further than this, and to give a lien on the land for taxes assessed against its owner in respect to any of his property, real or personal. The constitutionality of this legislation is unquestionable."

Cooley refers, of course, to a property tax, whereas in this instance, a license tax is involved. But the portion of the total license tax which is chargeable against each cannery is certain and ascertainable, and in that respect it is analogous to a property tax upon the individual properties themselves.

■ A more difficult problem is presented, however, when taxes allocable to one cannery are sought to be impressed as a prior lien on a different cannery which is subject to a pre-existing encumbrance. To do this would render it possible for a lien upon one piece of property to be extinguished by taxes arising from the activities carried on at an entirely different location, regardless of the vigilance of the lien-holder. This Court is not unmindful of the presumption that a person contracts "with reference to the liability imposed by the law, and is presumed to have knowledge of it and to govern himself accordingly in such contracts as he may choose to make." Donaldson v. Henning, 1913, 4 Alaska 642. In fact, reasonable arguments could be advanced that in this case it is not inequitable to impose

the Territory's lien upon the property superior to Schlo-
than's purchase money mortgage. Being charged with no-
tice of the existence of the statute, and having actual knowl-
edge that Einstoss was engaged in the canning business, the
use of the property for canning purposes and the resulting
accrual of taxes were not remote possibilities.

In a different situation, however, the sale could have been
made to a person who had not previously engaged in any
of the activities subject to the license tax, but who there-
after entered the canning business, or resold the property to
a third person who was in the canning business. The harsh-
ness of this law is apparent. Anyone who takes a lien upon
real or personal property in the Territory would do so with
the understanding that his lien could be entirely wiped out
by subsequent events which he would have no way of con-
trolling. Moreover, assuming, but without deciding, that
the legislature intended this lien to extend not only to all
the real and personal property of the person liable therefor
which was used in the business, but also to include all his
other property of whatever nature, the scope of this law
would be greatly expanded. Every credit sale of furniture
or an automobile would be consummated under the spectre
of the fisheries license tax. A citizen could even sell his
home to a neighbor who had never engaged in the cannery
business whatsoever and as part of the purchase price take
back a mortgage, which would certainly then be a first lien
upon the property. That person might thereafter engage
in the cannery business and incur a tax indebtedness to the
Territory, and the mortgage interest of the original owner
of the property could be wiped out; or, that neighbor could
transfer that home by deed to another who incurred can-
nery taxes, and again have the mortgage of the original
owner, which is a valuable property interest, entirely wiped
out. Would legislation giving a prior lien on encumbered

property other than that from which the tax arose constitute the taking of one man's property to pay the debt of another, and thus deprive him of property without due process of law? It has been suggested in several cases, notably Scottish American Mortgage Co. v. Minidoka County, 1928, 47 Idaho 33, 272 P. 498, 65 A.L.R. 663, and Advance Thresher Co. v. Beck, 1910, 21 N.Dak. 55, 128 N.W. 315, that a statute creating such a lien would be of doubtful constitutionality. In each of these instances, however, the courts refused to impute to the legislature the intention of creating a prior lien on property other than that taxed, and therefore the constitutional issue was not decided.

However, the dicta in the Scottish American Mortgage Co. and the Advance Thresher Co. cases was impliedly rejected by the Supreme Court in the case of International Harvester Credit Corporation v. Goodrich, 1956, 350 U.S. 537, 76 S.Ct. 621, 627, 100 L.Ed. 681, involving the New York Highway Use Tax Act, Tax Law, McKinney's Consol.N.Y.Laws, c. 60, § 501 et seq., which taxed carriers for their use of New York highways based upon the weight of the vehicle and the distance traveled over such highways. Sec. 506 of the New York Code provided:

> "§ 506. Payment of tax * * * The fees, taxes, penalties and interest accruing under this article shall constitute a lien upon all motor vehicles and vehicular units of such carrier. The lien shall attach at the time of operation of any motor vehicle or vehicular unit of such carrier within this state and shall remain effective until the fees, taxes, penalties and interest are paid, or the motor vehicle or vehicular unit is sold for the payment thereof. Such liens shall be paramount to all prior liens or encumbrances of any character and to the rights of any holder of the legal title in or to any such motor vehicle or vehicular unit."

In 1953, Eastern Cartage and Leasing Company, Inc., a carrier subject to the tax, purchased two trucks from International Harvester Co. and one truck from Brockway Motor Company, Inc. Each of the purchases was by a conditional sales contract, and those pertaining to the two sales by International Harvester Co. were duly assigned to plaintiff, International Harvester Credit Corp. Upon default by Eastern, the three trucks were repossessed. Thereafter, on April 21, 1954, the State asserted a lien for unpaid Highway Use taxes which had accrued against Eastern from January 1, 1952, through February, 1954.

In ruling that the prior lien, as measured by taxes on the carrier's operation of trucks other than the three in question, as well as taxes arising before the purchase of the trucks, was constitutional, the Supreme Court treated the lien provision as an amendment to the New York Uniform Conditional Sales Act, and compared it with a landlord's lien for unpaid rent, which is "enforceable against personal property found on the premises in the possession of the tenant, even though the legal title to such personal property may be in a third party who has allowed the tenant to have possession and beneficial use of it."

Quoting Justice Cardozo in Burnet v. Wells, 289 U.S. 670, 677–678, 53 S.Ct. 761, 77 L.Ed. 1439, the Supreme Court suggested that the test of due process was whether the statute was "one that an enlightened legislator might act upon without affront to justice."

As applied to the particular facts of the case it was determined that:

> (1) the lien is reasonable because both the carriers and the truck manufacturers benefit from the construction and maintenance of the New York highways, to which the proceeds of the tax are devoted;

(2) the burden placed upon the highways by an encumbered truck is just as great as that by an unencumbered truck;

(3) there is need for an effective lien to enforce a tax which cannot be computed or readily collected in advance.

In the present case the Territory's limited sources of revenue might well justify giving it a high degree of security for the collection of taxes, but in other respects, I believe that the reasons for the existence of the lien are less compelling than in the Goodrich case. For example, the benefit to the subordinated lien-holder under the commercial fisheries license tax is only that benefit which all citizens derive from an increase in the general tax fund. On the other hand, the revenue from the New York Highway Use Tax is devoted to the building and maintaining of highways—a distinct benefit to the manufacturers of trucks. Furthermore, a truck manufacturer is fully cognizant of the use to which his products will be put, while the vendor of property in Alaska would ordinarily be much less able to foresee the use of that property in an activity subject to the commercial fisheries tax. However, it does not appear that these distinctions are of such significance that, in the light of the Goodrich decision, the statute in question can be said to constitute an "affront to justice."

Other authorities lend support to the conclusion that this lien provision is within the scope of legislative power. In 84 C.J.S. Taxation § 600, p. 1210, it is stated:

"* * * where the statutes put all tax liens on the same plane, making no distinction between the lien which exists on land for the tax on personalty and the lien which exists for the tax on the land itself, making both paramount to other liens, or where a statute provides that the tax on personal

property shall be a lien on the owner's real property not to be removed until the tax is paid or the property sold for the tax, a personal property tax is a lien on the real estate of the person assessed superior to the lien of a prior mortgage; and, likewise, this is true where a statute expressly provides that the tax for personal property charged on real property shall have priority over any other lien."

In 51 Am.Jur., Taxation, Sec. 1016, p. 887, it is stated:

"It is doubtless competent for the legislature not only to make taxes a lien upon all the property of the owner of the property taxed, but to make such liens a first lien upon the property of the taxpayer, giving them priority over a mortgage or any other lien existing against the property, whether created before or after the assessment of the tax;"

See also Getchell v. Walker, 1929, 129 Or. 602, 278 P. 93 and Home Owners' Loan Corporation v. City of Phoenix, 1938, 51 Ariz. 455, 77 P.2d 818.

The plaintiff raises the further issue that the statute violates the due process clause because it failed to provide her with notice. She relies upon the case of Anderson v. Great Northern Ry. Co., 1914, 25 Ida. 433, 138 P. 127, 131, which passed upon the lien created in Sec. 1 of Ch. 226 of the Session Laws of Idaho for 1911. The Supreme Court of Idaho held the law to be invalid and void, and stated in its decision as follows:

"No process is 'due process' which does not give notice, either actual or constructive; and no 'taking of property' for debt is lawful, unless the debt has been created with the knowledge and consent of the debtor. This knowledge and consent may be constructive so far as it is necessary to

create a charge against property, but the statute which furnishes the constructive notice must provide process by which the claims may be measured and established, so the property owner may have a ready and certain method of knowing or ascertaining his liability. No such method is furnished by the statute under discussion * * *."

■ However, as Judge Hodge pointed out in the "freezer-ship cases" supra [140 F.Supp. 200]:

"It is not necessary that notice of lien be recorded, docketed or filed in the absence of statute requiring such. 53 C.J.S. Liens § 6, p. 850; United States v. Curry, D.C., 201 F. 371."

■ It is well established that the statute itself is constructive notice of the rights and obligations which it confers.

In Anderson National Bank v. Luckett, 1944, 321 U.S. 233, 243, 64 S.Ct. 599, 605, 88 L.Ed. 692, the court held:

"All persons having property located within a state and subject to its dominion must take note of its statutes affecting the control or disposition of such property and of the procedure which they set up for those purposes. Reetz v. People of State of Michigan, 188 U.S. 505, 509, 23 S.Ct. 390, 392, 47 L.Ed. 563; North Laramie Land Co. v. Hoffman, 268 U.S. 276, 283, 45 S.Ct. 491, 494, 69 L.Ed. 953. Proceedings for the assessment of taxes, the condemnation of land, the establishment of highways and public improvements affecting land owners, are familiar examples. Huling v. Kaw Valley Ry. & Imp. Co., 130 U.S. 559, 563–564, 9 S.Ct. 603, 605–606, 32 L.Ed. 1045;

Ballard v. Hunter, 204 U.S. 241, 254–257, 262, 27 S.Ct. 261, 264–267, 269, 51 L.Ed. 461."

The requirement of the Idaho court that the property owner have a ready and certain method of knowing or ascertaining his liability appears to be at variance with the conclusion of the Supreme Court in Hodge v. Muscatine County, Iowa, 1905, 196 U.S. 276, 281, 25 S.Ct. 237, 49 L.Ed. 477 and International Harvester Credit Corp. v. Goodrich, supra. In the latter case, not only did the vendors of motor vehicles lack a source for determining what taxes were charged against the vendees, but a statute made it a misdemeanor for state employees to disclose information concerning tax delinquencies, and yet the due process clause was not found to have been violated.

■■ The Court can come to no other conclusion than that the legislature has the power to declare taxes allocable to one piece of property, a prior lien on other property of the taxpayer, and that it has validly exercised such power in this instance. The words of Chief Justice Marshall in McCulloch v. State of Maryland, 1819, 17 U.S. 316, 427, 4 Wheat. 316, 427, 4 L.Ed. 579 are appropriate:

> "That the power of taxing * * * by the states may be exercised so as to destroy * * * is too obvious to be denied * * *."

> " * * * the power of taxing the people and their property, is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable, to the utmost extent to which the government may choose to carry it. The only security against the abuse of this power, is found in the structure of the government itself. In imposing a tax, the legislature acts upon its constituents. This is, in general, a suffi-

cient security against erroneous and oppressive taxation.

"The people of a state, therefore, give to their government a right of taxing themselves and their property, and as the exigencies of government cannot be limited, they prescribe no limits to the exercise of this right, resting confidently on the interest of the legislator, and on the influence of the constituent over their representative, to guard them against its abuse."

In the present case it is the tax lien, an integral part of the taxing power, which has aggrieved the plaintiff. As was pointed out in the Goodrich case, supra, the power to impose a tax lien is subject to the test of "reasonableness," and is not unlimited, but within the broad scope of "reasonableness," the taxpayer is equally dependent upon the legislature with regard to liens as he is with regard to the tax itself.

I agree with the Supreme Court of South Dakota, which stated in the case of Minneapolis Threshing Mach. Co. v. Roberts County, 1914, 34 S.D. 498, 149 N.W. 163, 165, L.R.A.1915D, 886:

"The results complained of are presumed to have been in the contemplation of the parties when the contract was made. If the statute is obnoxious because it acts as a restraint upon the free exchange or alienation of personal property, or renders it unsafe to deal in such property, then it should be repealed or amended, but this relief must be sought from the legislature and not from the court."

The power to tax is exclusively a legislative function and has not been extended in any manner to the judiciary. If

the tax is bad, burdensome, vicious, or destructive, the only remedy, if any exists, is by appeal to the legislature and not to the courts.

This division of authority between the legislature and the judiciary was illustrated in the State of Arizona. In the case of Maricopa County v. Equitable Life Assur. Soc., 1934, 42 Ariz. 569, 28 P.2d 821, a statute similar to Sec. 4(h) of the fisheries license tax act was given full effect by the court. Home Owners' Loan Corporation v. City of Phoenix, supra, a subsequent case also involving a conflict between a prior mortgage lien and a tax lien, pointed out that the legislature had amended the lien provision after the Maricopa County decision, and as a result, tax liens were made subject to pre-existing encumbrances on all property except that against which the tax was assessed.

> "As long as the legislature, in imposing a tax, does not violate applicable constitutional limitations or restrictions, the courts have no concern with the wisdom or policy of the exaction imposed, the political or other collateral motives behind it, the amount to be raised, or the persons, property or privileges to be taxed, such matters being exclusively for the lawmaking body, whose action will not be reviewed by the judiciary. A court may appropriately determine whether the property taxed was or was not within the taxing power, but if within the taxing power, the court may not determine that the power has or has not been discreetly exercised.

> "In the matter of raising revenue for the government, it has been said, the courts cannot set up their judgment against the legislative judgment in determining who shall be required to contribute. The remedy for oppressive taxation does not lie

with the judicial branch of the government, and the judicial power may not be invoked to correct oppressive taxation. Where, however, the legislature transcends its functions and violates one or more of the restrictions or limitations placed upon the taxing power by the Constitution, the judiciary has the right and duty to interpose and declare the attempted imposition invalid." 51 Am.Jur., Taxation, Sec. 47, p. 77–78.

■ In order to hold an act of the legislature in violation of the guarantees of the Constitution a court must find an abuse of power so unreasonable that the individual is deprived of rights no government may deny.

"When a legislative body having power to tax a certain subject matter actually imposes such a burdensome tax as effectually to destroy the right to perform the act or to use the property subject to the tax, the validity of the enactment depends upon the nature and character of the right destroyed. If so great an abuse is manifested as to destroy natural and fundamental rights which no free government could consistently violate, it is the duty of the judiciary to hold such an act unconstitutional. In any other case, however, since the taxing power conferred by the Constitution knows no limits except those expressly stated in that instrument, it must follow that if a tax is within the lawful power, the exertion of that power may not be judicially restrained because of the results to arise from its exercise." 51 Am.Jur., Taxation, Sec. 49, p. 80–81.

This Court finds that it was not the intention of the legislature to impose a lien upon after-acquired property beyond the interest of the taxpayer therein; that the lien for taxes

accruing prior to the date the taxpayer acquired this property and executed the mortgage on June 19, 1951, does not create a lien superior to the mortgage involved in this litigation.

I find that the cannery taxes accruing from the use of the property here involved as a cannery after the acquisition of said property by the defendant Einstoss create a lien superior to that of the mortgage; and, likewise, that other cannery taxes accruing after the acquisition of said property on June 19, 1951, and arising from the use of property elsewhere in the Territory, for which the defendant Einstoss became liable, are also a lien upon the property superior to the mortgage.

Therefore, the priorities would be

First: Fisheries license taxes, including penalties and interest, owing to the Territory from the operation of any of defendant Einstoss' canneries since June 19, 1951; and

Second: Balance of the note held by the plaintiff.

The foregoing shall constitute findings of fact and conclusions of law unless either party desires additional findings, in which event the same may be presented on motion. Judgment and decree may be entered in accordance with this opinion.