## STUDDERT v. TANANA VALLEY GOLD DREDGING CO.
Limited, et al.
No. 3378.
Fourth Division.
Jan. 29, 1931.

268

Albrecht and Taylor, of Fairbanks, for plaintiff.

John A. Clark, of Fairbanks, for defendant First Nat. Bank of Fairbanks.

CLEGG, District Judge.

The contention of the plaintiff is that the gold, gold dust, and amalgam described in the complaint comes within the terms of the statute defining the right of mine laborers to claim a lien on dumps, and that it is embraced in the definition of the word "dump" as set forth in the Session Laws of Alaska for the year 1915, c. 13, so that the only question the court has to decide is whether, under the facts as stated and the law applicable thereto, the contention of the plaintiff can be sustained, or whether the contention of the defendant that under these facts the plaintiff has no lien upon this gold, gold dust, and amalgam can be sustained.

There is really nothing to be referred to for the purpose of determining this controversy except the language of the statute itself. I might say in passing that the same question identically was before this court at Nome upon a statute of similar character which was passed by the same Legislature in the year 1913 (Laws 1913, c. 79), and which was amended by the act now under consideration in the year 1915, which enlarged, amplified, and clarified the statute with reference to the lien of miners on dumps. When the court discussed that matter in the case of Nordstrom v. Sivertsen-Johnsen Mining & Dredging Co., which is reported in 5 Alaska, 204, the court did not have the benefit of the statute as it was afterwards and is now amplified, but, in my judgment, decided the question correctly.

This law that the court now refers to with reference to lien of miners on dumps is easily separable into three main divisions, although it is incorporated in the statute in one whole and inclusive paragraph. Dividing it as it ought to be divided into paragraphs, it would read as follows:

(1) "Every person who shall labor in or upon any mine or mining ground for another, in digging, conveying, thawing, hoisting, piling and cleaning up, or in any other kind of work in the production of any minerals or mineral bearing sands, gravels, earth, ore rock, gold or gold dust or other mineral, or shall aid or assist therein by his labor as cook, engineer, or fireman, or in cutting wood used in such work, or in like capacity in the production of a dump or mass of minerals, mineral bearing sands, gravels, earth, ore, rock, gold and gold dust therein or extracted therefrom."

(2) "Shall have a lien on such dump or mass of minerals, mineral bearing sands, gravels, earth, rock, ore, gold and gold dust or other minerals contained therein and extracted therefrom, to secure the amount due the said laborer in the production of the same."

(3) "Such lien shall attach to the dump or mass of minerals, mineral bearing sands, gravel, earth, ore, rock and gold or gold dust or other minerals therein, whether the same be deposited on the ground in a mass or dumped into bunkers or hoppers, or placed in sluice boxes at the mine, and the gold, gold dust and other minerals therein, so long as the same is in one mass and can be identified as being produced through the labor of the lienor."

These three sections must be read together with the definition of "dump" as set forth in section 13 of the same act, which reads as follows: "And the term 'dump' shall be construed to mean the mineral bearing sands, earth, ore, rock and minerals extracted, hoisted and raised from a mine, including coal while in mass at the mine or on the mining claim from which extracted, whether the

same be deposited in dumps or piles, or placed in hoppers or tanks, or in sluice boxes or bunkers, or other receptacles, and whether partially reduced from its primary state or not."

This definition of "dump" clarifies the whole intent of the Legislature in passing this act, and construes the language of the act as heretofore used with reference to the question of liens on dumps.

It will be noticed that the phrase which qualifies the words "including coal," to wit, "while in mass at the mine or on the mining claim from which extracted," does not refer to the previous designation of "sands, earth, ore, rock and minerals extracted, hoisted and raised from a mine," but only refers to the word "coal." But the following language is very significant in view. of the contention made in this case, namely: "Whether the same be deposited in dumps or piles, or placed in hoppers or tanks, or in sluice boxes or bunkers, or other receptacles, and whether partially reduced from its primary state or not."

■ Clearly, in my judgment, the Legislature intended, by the use of this language, to refer only to sands, earth, ore, rock, and minerals which were either deposited in dumps or piles, placed in hoppers or tanks or in sluice boxes or bunkers, or other receptacles, located in the same place. And the words "other receptacles," of course, must be interpreted and construed as meaning receptacles of like character to those already mentioned, that is, hoppers, tanks, sluice boxes and bunkers, and could have no reference to gold, gold dust, and amalgam for ten days removed from the place where it was produced and delivered into the hands of a third person, such as the First National Bank of Fairbanks, Alaska, defendant.

■ This is made clear also from the following language of the act in the same connection, to wit: "Whether partially reduced from its primary state or not." That is to say, where the gold, as it is shown and claimed to be in this case, is already extracted from everything that

it was associated with originally and is now in the form of a mass of gold dust and quicksilver, it is reduced, so far as the ordinary miner can reduce it, entirely and wholly into a state different from its original state, and it is no longer, in the language of the act, "partially reduced from its primary state." It is entirely and wholly reduced from its primary state, and it is associated with something that has been introduced for the purpose of collecting it and gathering it up, namely, quicksilver, and it is a different product entirely now to what it was when it was associated with its original elements in Mother Earth.

■ ■ Another consideration that ought not to be overlooked is the fact that it is plainly inferable from the allegations of the complaint that this gold, gold dust, and amalgam, which it is alleged was delivered to the bank for purposes of assay, was delivered for other purposes also in connection with assay. For instance, it is alleged in the complaint that the defendant First National Bank is a corporation duly organized to conduct, and conducting, a banking business in the town of Fairbanks, Alaska. It is not alleged that the bank is conducting any commercial assay business. So, construing the pleading against the pleader, as is universally done, it must be concluded from this allegation that the purpose of the delivery of this gold, gold dust, and amalgam, even for assay to the First National Bank, was accompanied with some further instructions on the part of the dredging company as to security, or to be applied on an indebtedness of the dredging company, and that the bank necessarily is compelled to assay the gold, gold dust, and amalgam in order to determine its fineness and to know at what rate to compute the value of the gold dust after it is assayed.

So it is clear, in my view, that the court is clearly correct in holding now that the demurrer should be sustained, and that the complaint states no cause of action for the foreclosure of liens on this property.

The demurrer is sustained.