WINFREE, Justice.
I. INTRODUCTION
In 1910 the United States Congress passed Alaska's first mineral dump lien statute, granting laborers a lien against a "dump or mass" of hard-rock minerals for their work creating the dump. After piecemeal revisions, Alaska's 1933 territorial legislature amended the dump lien statute to include oil and gas development, creating a framework for technological advances in the state's nascent oil and gas industries. The mineral dump lien statute has remained substantively unchanged since, and we have infrequently addressed it.
We accepted certified questions from both the United States District Court and the United States Bankruptcy Court regarding the scope of the mineral dump lien statute as applied to natural gas development. For the reasons that follow, we conclude that the statutory definition of "dump or mass" reflects that a mineral dump lien may extend only to gas extracted from its natural reservoir, that the lien may cover produced gas contained in a pipeline if certain conditions *770 are met, and that to obtain a dump lien laborers must demonstrate that their work aided, broadly, in gas production.
II. FACTS AND PROCEEDINGS
A. All American v. Cook Inlet
The relevant facts of this case are not in dispute.[1] Cook Inlet Energy, LLC operates oil and gas wells in southcentral Alaska. In November 2014 Cook Inlet contracted with All American Oilfield, LLC to "drill, complete, engineer and/or explore three wells" on Cook Inlet's oil and gas leaseholds. All American began work soon thereafter, including drilling rig operations, digging holes, casing, and completing the gas wells. When All American concluded its work the following summer, Cook Inlet was unable to pay. In June 2015 All American recorded liens against Cook Inlet, including a mine lien under AS 34.35.125 and a mineral dump lien under AS 34.35.140. In October, after its creditors filed an involuntary petition for relief, Cook Inlet consented to Chapter 11 bankruptcy proceedings.
In January 2016 All American filed an adversary proceeding in the bankruptcy court "to determine the validity and priority of its secured claims." The bankruptcy court found that All American has a valid mine lien against the three wells.[2] But the court denied All American's asserted mineral dump lien against unextracted gas remaining in natural reservoirs.[3] The court also concluded that All American's mine lien is subordinate to Cook Inlet's secured creditors' prior liens, which would consume all of Cook Inlet's assets and leave All American with nothing.[4] All American appealed to the federal district court, which, in turn, certified to us questions regarding the Alaska mineral dump lien statute.
B. Charles Gebhardt v. Carol Inman
Carol Inman, d/b/a Starichkof Enterprises, provided equipment, labor, and services to Cook Inlet. Charles Gebhardt, the appointed trustee for Cook Inlet's liquidation trust,[5] sued Inman to recover payments Cook Inlet made to her before the bankruptcy. In October 2017 Gebhardt filed a motion for partial summary judgment, asserting that there was no genuine issue of material fact that the payments to Inman were avoidable preferred payments.[6] Inman opposed the motion, asserting an inchoate lien defense. Inman had not recorded a mineral dump lien; she asserted that, had she not been paid for her work, she could have recorded a valid mineral dump lien that would have attached to property valued in excess of the amount she was owed. She contended that this inchoate lien constituted a complete defense to the trustee's attempt to avoid the payments made to her before the bankruptcy.
Inman filed a motion to certify to us the questions interpreting the mineral dump lien in her case, which the bankruptcy court granted.
C. The Certified Questions
We accepted the following certified questions:
*771 1. Can a "dump lien" under AS 34.35.125 et seq. apply to gas stored in its natural reservoir; if so, was a mineral "dump" created under AS 34.35.140 and AS 34.35.170(1) when All American drilled three natural gas wells at the request of Cook Inlet?
2. Is a mineral "dump" created under AS 34.35.140 and AS 34.35.70(a)(1) each time that Cook Inlet releases natural gas from the natural reservoir in which the gas was formed and transports that gas through a pipeline to the point of sale?
3. Must a dump lien claimant under AS 34.35.140 prove, in order to have a valid dump lien, that the produced gas was, in whole or in part, the product of her labor?[7 ]
The parties provided full briefing on these issues, and the State filed an amicus brief at our request. We now hold that the answer to the first question is "no." The second question presents factual determinations we leave to the triers of fact, but we hold that gas in a pipeline may be subject to a dump lien if other conditions are satisfied. We hold that the answer to the final question is "yes."
III. STANDARD OF REVIEW
Appellate Rule 407(a) allows us to answer certified questions that "may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in [our] decisions." Answering certified questions requires that we "stand in the shoes of the certifying court, yet exercise our independent judgment."[8] "This entails 'selecting the rule of law that is most persuasive in light of precedent, reason, and policy.' "[9]
IV. DISCUSSION[10]
A. Unextracted Natural Gas Remaining In Its Natural Reservoir Cannot Constitute A "Dump" Under The Mineral Dump Lien Statute.
1. Statutory framework
Alaska has three statutes allowing workers to attach liens to mines, mining equipment, or minerals. Alaska Statute 34.35.125 allows a person who performs work on a mine or oil well to attach a lien to "the mine or mining claim, oil, gas, or other claim or well as security for the payment of the work." Alaska Statute 34.35.130 allows a person who performs work on a mill or machine used in a mining operation to have "a lien on the mill or machine, to secure the payment of the amount due for the work." These two statutes create preferred liens, with precedent over other liens excepting those recorded before the work resulting in the lien claim started.[11]
Alaska Statute 34.35.140(a), at issue in this case, provides:
*772 A person who, at the instance of another who has the right of possession of a mine, or mining claim, oil or gas well, performs upon, in, or about the mine or well any of the kinds of work mentioned in AS 34.35.125, or who performs any other kind of work in the production, piling up, or storing of a dump or mass of mineral, has a lien on the dump or mass, and the gold, gold dust, or other minerals contained in or extracted from it, to secure the amount due the laborer in the production of the minerals.
The dump lien statute thus describes: (1) the types of work qualifying "a person" for the lien - "any of the kinds of work mentioned in [the mine lien statute], or ... any other kind of work in the production, piling up, or storing of a dump or mass of mineral"; (2) the property to which the lien attaches - "the dump or mass, and the ... minerals contained in or extracted from it"; and (3) the types of debts the lien satisfies - "amount[s] due the laborer in the production of the minerals."[12]
A "dump or mass" is defined in AS 34.35.170(a)(1) as:
[M]ineral-bearing sands, gravel, earth, ore, stone, coal, oil, gas, other fluids or minerals extracted, hoisted, and raised from a mine or mining claim, while in mass at the mine or on the mining claim or adjacent to it, whether it is deposited in dumps or piles, or placed in hoppers, tanks, or reservoirs, or in sluice boxes or bunkers or other receptacles and whether partially or wholly reduced from its primary state or not. (Emphasis added.)
A dump or mass thus must: (1) consist of specific types of matter; (2) be "extracted, hoisted, and raised from a mine or mining claim"; (3) be "in mass"; and (4) be "at the mine or on the mining claim or adjacent to it."[13]
In contrast to the other two liens over mines and mining equipment, the dump lien created by AS 34.35.140 is "prior and preferred" over other liens, "whether given before or after the work for which the lien is claimed is started."[14] Because a dump lien has priority over other liens,[15] a bankruptcy proceeding creditor would prefer holding a dump lien to increase the creditor's chance of being paid if the bankruptcy estate is not large enough to satisfy all obligations.
2. The dump lien statute's plain language excludes unextracted gas remaining in its natural reservoir.
All American argues that the dump lien statute applies to unextracted gas remaining in its natural reservoir and that it gained a dump lien by drilling natural gas wells for Cook Inlet. All American's interpretation primarily relies on implied legislative history and policy arguments. We conclude that the history and policy arguments are not sufficient to overcome the statute's contrary plain language.
The statutory framework makes clear that for a claimant to obtain a dump lien, there must be a "dump" to which the lien can attach.[16] The existence of a dump is a condition precedent to obtaining a dump lien, and we therefore strictly construe the statutory definition.[17] Under the statute's plain meaning, unextracted gas cannot constitute a dump because it was never "extracted, *773 hoisted, and raised" as the statutory definition requires.[18]
All American's contract contemplated that it would assist Cook Inlet with natural gas extraction, but All American's work apparently was limited to establishing natural gas wells. All American states that it "performed drilling, exploration, engineering, and other work to access the natural gas contained" in the reservoir. All American explains that it "explored, drilled, managed, and ultimately provided valuable labor in both finding the gas and creating a mechanism (the well) by which [Cook Inlet] was able to extract the gas." But the gas over which All American claims it has a dump lien was not "extracted, hoisted, and raised."[19]
Although the certified question asks whether the dump lien applies to natural gas stored in its native reservoir, All American instead discusses whether unproduced gas that has never left its natural reservoir can be subject to a dump lien. As the State notes, although "unextracted gas may remain in its reservoir until it is produced, this is not gas storage." Gas storage specifically "requires prior production and a separate agreement with the State."[20] In other words, produced gas reinjected and stored in a natural reservoir has been "extracted, hoisted, and raised" and might qualify as a dump.
All American contends that the words "extracted, hoisted, and raised" effectively must be ignored to satisfy the dump lien statute's purpose. But based on this plain language, because the gas for which All American drilled wells never was "extracted, hoisted, and raised" from the mine, it cannot qualify for a dump lien under AS 34.35.140. Although unextracted gas cannot constitute a dump, All American still may obtain a non-preferred mine lien under AS 34.35.125, as the definition of "mine" or "mining claim" broadly includes "all valuable mineral deposits, including coal, oil, gas , or other fluid, and all loads, veins, or rock in place containing minerals ."[21]
3. Neither legislative history nor case law extends the "dump" definition to include unextracted gas remaining in its natural reservoir.
Despite a dearth of legislative history, All American argues that we should liberally interpret the dump lien statute and its accompanying definition based on AS 34.35.930 's provision that the lien chapter "is remedial and its provisions shall be liberally construed." All American likens the dump lien statute to "a legal contraption that has been significantly amended through patchwork additions, but never revised" and argues that the "legislative purpose and intent of the 1933 amendments was to provide companies like [itself] with [d]ump [l]ien protection." But even before "dump" was explicitly defined, earlier versions of the dump lien statute consistently required that minerals be removed from the ground to qualify as a dump to which a dump lien could attach.
Alaska's first dump lien statute was passed in 1910 by the United States Congress.[22] This earliest iteration granted a lien to laborers for work performed on "the dump or mass of mineral-bearing sands, gravels, earth, or rocks, and all gold and gold dust, or other minerals therein, and all gold and gold dust extracted therefrom."[23] The statute neither defined "dump" nor required that all minerals be "extracted, hoisted, and raised" from the mine itself.[24] Congressional debate from 1910 - the only existing legislative history accompanying any version of the statute - indicates that the statute sought "to extend the lien of miners greater than it is at present."[25] At that time Alaska apparently provided that every "person performing labor *774 or furnishing material of any kind to be used in the construction, development, alteration, or repair, either in whole or in part, of any building, ... [or] mine, ... shall have a lien upon the same for the work or labor done."[26] But the law did not "give the miner who digs the ore or the mineral-bearing gravel out of the earth any lien at all for his labor."[27]
Congress apparently thought it necessary for the miner to have such a lien given the "practical operations of mining in Alaska."[28] The congressional record explains:
[I]n the practical operations of mining in Alaska the mineral-bearing gravel is removed in the winter time. When the spring comes, the "dump," as it is called, is put through a process of washing out the gold and gold dust and minerals that are contained therein. It very frequently happens that the person who operates the mine is obliged to borrow considerable money as he commences to operate the mine. When spring comes, it may be that the mortgagee then forecloses his mortgage, on which he has received interest to the amount of 4 to 6 per cent a month. After his mortgage is satisfied there is nothing left to go to the miner, who has produced this dump, there being no law giving him any security for his labor.[29 ]
The law did not "give [the miner] a lien upon the mine, but [rather] a lien only upon that which his labor has produced, namely, the dump, and the gold or gold dust contained therein or extracted therefrom."[30]
Alaska's territorial district court considered the 1910 dump lien statute in Donaldson v. Henning .[31] Because the statute did not define "dump," the court looked to the term's common usage by miners: "[T]he term 'dump' usually refers to the pile or mass of gold-bearing earth or gravel hoisted from a mine, prior to the time that it has been washed and the gold and gold dust extracted therefrom."[32] Even before a statutory definition, courts and common usage defined "dump" as containing only minerals actually "hoisted from a mine."[33]
Alaska's territorial district court again considered the dump lien statute a year later in Nordstrom v. Sivertsen-Johnsen Mining & Dredging Co .[34] Applying the 1910 version of the statute, the court looked to the dictionary definition of "dump" and found that the legislature "meant the mineral-bearing sands piled up or collected into an aggregate heap or body, and not the mineral-bearing sands or dirt that has been only loosened or broken up, but not piled up on the surface of the ground in some place."[35]
Alaska's 1913 territorial legislature amended the dump lien statute.[36] The amended statute provided, in relevant part, that the "lien shall attach in every case to such mine, lode, mining claim, deposit, and the ore, gold bearing earth, rock, gravel, sand, gold, gold dust or other precious mineral mined, taken and extracted from such mine, lode, mining claim, deposit."[37] Although the statute did not use the term "dump," it still required that minerals be "mined, taken and extracted" from the mine to be lienable.[38]
Alaska's 1915 territorial legislature again amended the dump lien statute.[39] This iteration reintroduced the term "dump" and separated mine liens from dump liens.[40] The dump lien attached to "the dump or mass of minerals ... and gold or gold dust or other *775 minerals therein."[41] Perhaps more importantly, for the first time since the lien statute's inception, the legislature explicitly defined the term "dump" and required that the materials comprising the "dump" be "extracted, hoisted, and raised from a mine."[42] The 1915 statute - like the 1913 statute - required that minerals be "extracted, hoisted, and raised" from the mine to constitute a dump to which a lien could attach.[43]
Alaska's 1933 territorial legislature again amended the dump lien statute, varying from the current version only by renumbering.[44] The 1933 statute reorganized and reworded the mining lien statutes, revising them to explicitly encompass oil and gas in addition to hard-rock minerals.[45] The statute expanded the definition of "mineral" to include oil and gas, and it expanded the definition of "dump or mass" to include "mineral bearing sands, gravel, earth, ore, stone, coal, oil, gas, other fluids or minerals extracted, hoisted and raised from a mine."[46] Minerals comprising a dump could be "deposited in dumps or piles, or placed in hoppers, tanks or reservoirs, or in sluice boxes or bunkers or other receptacles," but nonetheless needed to be "extracted, hoisted and raised from a mine."[47]
The requirement that minerals be "extracted, hoisted, and raised from a mine" has remained consistent from the dump lien statute's 1910 inception through each of its iterations. The statute's legislative history is consistent with its plain language and suggests no reason to depart from the requirement that a dump lien attaches to minerals, including gas, only when "extracted, hoisted, and raised from a mine." Thus All American's argument that the legislature intended to extend a dump lien to unextracted gas remaining in its natural reservoir is inaccurate.
4. Applying the dump lien statute as written does not lead to glaringly absurd results.
All American's final argument is that requiring gas to be "extracted, hoisted, and raised" leads to "absurd results" given that in 1933 "there was no commercially-available technology to store natural gas anywhere other than in the native reservoir" and that the "industry practice continues to be to store the gas in its native reservoir once the well is drilled." All American asserts that, "[u]nlike other minerals, natural gas is not extracted from a mine and placed into a 'pile,' nor has it ever been, nor could it ever be." All American contends that, by requiring gas to be extracted, the statute would exclude "over 90% of the natural gas produced in [Alaska] from the reach of the dump lien statute, and effectively nullif[y] the [s]tatute's application to the industry."
To support its proposition that "in Alaska more than 90% of natural gas is stored in the native reservoir," All American relies on an expert report introduced in the bankruptcy court. The report examines the term "reservoir" and focuses on gas produced specifically in Cook Inlet, stating that "some 10% of the overall Cook Inlet-produced gas volume *776 is involved in local storage operations on an annual basis." The report also explains that "[n]one of [the several gas storage reservoirs in Alaska] were authorized and active as gas storage reservoirs before 2001."
"We have recognized that '[i]n ascertaining the legislature's intent, we are obliged to avoid construing a statute in a way that leads to a glaringly absurd result.' "[48] But "[w]e have refused to nullify statutes, however hard or unexpected the particular effect, where unambiguous language called for a logical and sensible result."[49]
Contrary to All American's contentions, we conclude that interpreting AS 34.35.140 according to its plain meaning does not lead to a "glaringly absurd result."[50] As Cook Inlet and the State contend, historical sources and case law from other jurisdictions indicate that gas extraction and storage existed elsewhere in the United States when the 1933 statute including oil and gas was passed, and, as the State argues, Alaska's 1933 legislature thus "could have reasonably believed that extending the dump lien statute to oil and gas might at least have some potential practical applications."[51] The legislature may have anticipated upcoming technological developments in the oil and gas industry and may have passed the dump lien statute and accompanying definition to create a framework for Alaska's future oil and gas laborers. All American appears to acknowledge that gas extraction and storage outside of a natural reservoir were possible in 1933, quoting a geological survey providing that the "earliest successful [off-site] underground natural-gas storage was completed in 1915 in Welland County, Ontario, Canada. In 1916, operations were begun at Zoar Field near Buffalo, New York, but developments of many such facilities did not commence until 1937."[52] (Emphasis omitted.)
That only a "small percentage of natural gas" would be subject to a dump lien does not nullify the statute. The legislature specifically chose to include gas in the dump lien statute, and, as written, the statute can be applied without leading to glaringly absurd results.[53]
5. Conclusion
The answer to this first certified question is "no." The plain language of the dump lien statute and accompanying definition excludes unextracted gas remaining in its natural reservoir. The dump lien statute's legislative history and case law do not counsel extension of this definition, and affording the statute its plain meaning does not lead to glaringly absurd results. We previously have considered "the historical importance of mining for precious metals and the present importance of oil drilling to the Alaska economy," and have noted that "[t]echnological advances in the mining industry ... require us to adapt the *777 language in [earlier] cases to modern times."[54] But we also have recognized that "we must respect the underlying principles embodied in those cases and the statutes upon which they relied."[55] Because a dump lien cannot apply to gas remaining in its natural reservoir that has never been "extracted, hoisted, and raised," All American's drilling of natural gas wells did not create a dump, and a dump lien did not attach under AS 35.34.140.
B. Natural Gas In A Pipeline May Constitute A Dump If Certain Factual Conditions Are Met.
The second certified question, whether a dump or mass is created each time gas flows through a pipeline, is a closer question. Based on the statutory definition, gas constitutes a dump or mass if it: (1) has been "extracted, hoisted, and raised from the mine or mining claim," (2) is "in mass," and (3) is "at the mine or on the mining claim or adjacent to it."[56] We hold that natural gas in a pipeline meets the first two requirements, but we leave the question whether the particular gas in Cook Inlet's pipelines is at, on, or adjacent to the mine or mining claim to the trier of fact in each case.
1. Gas in a pipeline has been "extracted, hoisted, and raised from the mine or mining claim."
Gas must be "extracted, hoisted, and raised from the mine or mining claim" to qualify as a dump.[57] All American, Inman, and the State agree that gas in a pipeline has been extracted from the ground and hoisted and raised from its native reservoir into the pipeline. But Cook Inlet argues that gas in a pipeline does not meet this statutory requirement because pipelines are included in the definition of mine or mining claim,[58] and a dump must be "extracted, hoisted, and raised from a mine or mining claim ." (Emphasis in original.) Cook Inlet contends that gas must be "removed" from the mine, and because gas in a pipeline is still part of the mine itself, it is not a "dump."
Cook Inlet's argument fails to recognize either the breadth of the definition of "mine or mining claim" or the distinction between a "dump" and its location or container. The definition of "mine or mining claim" is broad; it includes five primary categories of property: (1) "a block or parcel of mining ground"; (2) "all valuable mineral deposits"; (3) various structures "below the surface of the ground"; (4) various above-ground structures "affixed to the ground and used in the working, mining, and development"; and (5) various "appurtenances," including roads and pipelines.[59]
Based on this broad definition, it is possible for a dump to be created if it is "deposited" on or "placed in" property that is itself part of the mine or mining claim.[60] For example, mineral-bearing sands piled on a "parcel of mining ground"[61] would qualify as a dump, as would oil pumped into a "tank[ ]"[62] that also happened to be "affixed to the ground and used in the working, mining, and development"[63] of the mine. Likewise there is no reason that gas in a pipeline cannot constitute a dump, even when the pipeline itself is part of the "mine or mining claim."
Cook Inlet's suggested interpretation of the statute also fails to reconcile all of the requirements in the "dump" definition. A dump or mass must both be "extracted, hoisted, and raised from a mine or mining claim" and "in mass at the mine or on the mining claim or adjacent to it."[64] It thus is clear that minerals could not be entirely removed *778 from a mine and still constitute a dump. We instead interpret "extracted, hoisted, and raised" to require that minerals must cease being "mineral deposits" that are part of the mine,[65] not that the minerals must be removed entirely from the mine and its component parts. Gas ceases to be a mineral deposit when it is severed from the land, i.e., "extracted from the soil and brought to the surface."[66] Because gas in a pipeline has been "extracted from the soil and brought to the surface," it has been "extracted, hoisted, and raised from a mine or mining claim."
2. Gas in a pipeline is "in mass."
Alaska Statute 34.35.170(a)(1) also requires gas to be "in mass" to constitute a dump. The statute provides that a dump is "in mass ... whether it is deposited in dumps or piles, or placed in hoppers, tanks, or reservoirs, or in sluice boxes or bunkers or other receptacles."[67] Consistent with the conclusion reached by the territorial district court in Studdert v. Tanana Valley Gold Dredging Co. , we conclude that the "whether" clause limits the ways that a dump can be "in mass" to the enumerated examples.[68] The term "whether," when used as a conjunction, introduces "alternative" possibilities that have "qualifying or conditional force."[69]
Following this interpretation, the only way for natural gas to be "in mass" would be for it either to be "deposited in dumps or piles" or "placed in hoppers, tanks, or reservoirs, or in sluice boxes or bunkers or other receptacles."[70] Because gas has no fixed shape or volume, it cannot be deposited in a dump or pile. We must therefore determine whether natural gas pumped out of its natural reservoir into a pipeline on its way to another destination is "placed" into a "receptacle" for the statute's purposes. Cook Inlet and Gebhardt argue that a pipeline is not a "receptacle" containing a dump because, unlike the statute's other listed examples, a pipeline is used for transportation, not storage.
A "receptacle" is "[t]hat which receives or holds anything for rest or deposit."[71] We apply the ejusdem generis canon of construction and interpret the word "receptacle" "in light of the characteristics of the specific terms" that precede it.[72] All but one of the statute's listed receptacles primarily are used to hold or store materials. "Tanks" and "reservoirs" both are used to store liquids or gases.[73] "Bunkers" are "large bins" used to *779 store materials.[74] "Hoppers" also are bins or vessels that typically have a door or chute on the bottom that can be opened to remove their contents, and can be used for storage[75] or as a temporary holding place.[76] The outlier among the enumerated receptacles is the "sluice box." Unlike the other listed receptacles, sluice boxes are used primarily to separate valuable minerals from waste minerals.[77] But like the other receptacles, they hold a quantifiable amount of materials in one place.
We conclude that pipelines are sufficiently similar to tanks, reservoirs, bunkers, hoppers, and sluice boxes to qualify as "receptacles." Unlike tanks, reservoirs, bunkers, and hoppers, the primary purpose of a pipeline is not to hold something, but to transport it from one place to another.[78] But the inclusion of "sluice boxes" in the enumerated list of receptacles indicates that a "receptacle" under the statute does not need to only or primarily hold its contents. In the process of conveying a gas, pipelines do "hold" or "contain" it for a brief period of time, as a "receptacle" would.
As All American notes, it also appears that natural gas can be stored in a pipeline to enable a gas producer to respond to changes in demand.[79] In some pipeline systems, a certain level of gas must be stored in the system to maintain pressure levels.[80] The gas stored in a pipeline is called "line *780 pack," and its volume can be calculated.[81] The incidental storage function of pipelines is similar to that of sluice boxes, which are used to separate gold from sand and gravel and likely only store the gold for a short time. Because pipelines are "receptacles," we conclude that gas in a pipeline is "in mass."
3. Whether gas in a pipeline is "adjacent" to the mine or mining claim to constitute a dump is a factual question left to the trier of fact.
Gas in a pipeline also must be "at the mine or mining claim or adjacent to it" to qualify as a dump.[82] The statute does not clearly answer whether a large receptacle located partly on the mine, but mostly off the mine, can qualify as being "at the mine or on the mining claim or adjacent to it." To determine whether a pipeline that is only partially on a mine or mining claim satisfies the requirement, courts will need to engage in a fact-specific inquiry to determine if the off-mine portions are close enough to be considered "adjacent" to the mine. Because neither the bankruptcy court nor the district court made findings about the exact location and size of the pipelines at issue in these cases, we leave these conclusions to the triers of fact.[83]
4. Conclusion
Because gas in a pipeline has been "extracted, hoisted, and raised" and is "in mass," it may constitute a dump if the gas is located "adjacent" to the mine or mining claim. This determination must be made on a case-by-case basis,[84] and we leave to the trial courts the answer whether in these cases the gas qualifies.
C. Dump Lien Claimants Must Prove That Their Work Aided, Broadly, In Producing Minerals.
As posed, the final certified question asks whether dump lien claimants must prove that produced gas is the product of their labor. The answer is "yes." Alaska Statute 34.35.140(a) plainly requires that lien claimants make this showing, providing that the dump lien is "to secure the amount due the laborer in the production of the minerals ." (Emphasis added.) This is in contrast to AS 34.35.125, providing a lower priority mine lien "as security for the payment of the work ." (Emphasis added.) Laborers working on mines thus may obtain dump liens to secure amounts owed only for work "in the production of the minerals"; other work may be secured by a mine lien.
Framing this certified question differently, the more important consideration is the required connection between a laborer's work and the production of the minerals. Alaska Statute 34.35.140(a) provides that a claimant may be entitled to a dump lien by performing "any of the kinds of work mentioned in AS 34.35.125" or "any other kind of work in the production, piling up, or storing of a dump or mass of mineral." Alaska Statute 34.35.125, in turn, lists as work entitling a claimant to a mine lien:
opening up, developing, sinking, drilling, drifting, stoping, mucking, stripping, shoveling, mining, hoisting, firing, cooking, teaming, or perform[ing] any other class or kind of work necessary or convenient to *781 the development, operation, working, or mining of the claim or well; ... perform[ing] work tending to or assisting in the developing, extraction, separation, or reduction to a commercial value of the minerals; ... perform[ing] work on a water right, ditch, flume, pipe line, tramway, tram, road, or trail, used in connection with the opening up, or to facilitate the opening up, operation, or development of the claim or well, or the extraction of the minerals.
The statutory language describing allowable work in AS 34.35.140, and in AS 34.35.125, by reference, is expansive. As the superior court found in D.H. Blattner & Sons, Inc. v. USMX, Inc. , dump liens "are not restricted to labor specifically devoted to the production of minerals."[85] We affirmed this conclusion on appeal, perhaps inarticulately, holding that the petitioner in that case "need not prove that covered work produced the minerals against which the lien is claimed."[86] By that language we meant precisely what the superior court said, namely that "[a] fair reading of the statutes ... places a broad umbrella over the types of work that will allow a person to claim a dump lien, beyond those who can prove they actually produced the minerals."[87] Because "production" encompasses more than bringing subsurface minerals above ground,[88] a laborer may claim and enforce a dump lien by performing any of the kinds of work mentioned in the dump and mine lien statutes. Whether a particular claimant's labor meets these requirements is a fact- and case-specific inquiry, and we leave the answers in these cases to the triers of fact.
V. CONCLUSION
The answer to the first certified question, whether All American's drilling of gas wells created a dump under AS 34.35.140, is "no." We leave the answer to the second certified question, whether Cook Inlet creates a dump each time it releases gas into its pipelines, to the trier of fact, but we hold that gas in a pipeline may be considered a dump if it is "adjacent" to the mine or mining claim. The answer to the final certified question, whether produced gas must be the product of the lienor's labor as defined in the dump and mine lien statutes, is "yes."

"[W]hen answering certified questions we 'rely ... on the federal court's fact statements and the excerpt. We make no independent fact determinations.' " Attorneys Liab. Prot. Soc'y, Inc., v. Ingaldson Fitzgerald, P.C. , 370 P.3d 1101, 1103 n.2 (Alaska 2016) (omission in original) (quoting C.P. ex rel. M.L. v. Allstate Ins. Co. , 996 P.2d 1216, 1218 n.1 (Alaska 2000) ).

In re Cook Inlet Energy LLC , No. A15-00236-GS, 2017 WL 1082217, at *9 (Bankr. D. Alaska Mar. 21, 2017).

Id.

See id.

Contemporaneous with Cook Inlet's bankruptcy, its parent company, Miller Energy Resources, Inc., voluntarily filed for bankruptcy. That case was jointly administered with Cook Inlet's case, and the joint debtors ultimately confirmed a joint reorganization plan creating a liquidation trust to administer various assets, including causes of action, for the benefit of the debtors' unsecured creditors. Gebhardt is the appointed trustee for the Miller Energy Resources Creditors' Liquidation Trust.

A bankruptcy trustee has the power to "avoid" certain pre-petition transfers to third parties and recover that money for the bankruptcy estate. See 1 Norton Bankr. L. & Prac. 3d § 3:11 (2019) ; 11 U.S.C. § 550(a)(1) (2012) (allowing bankruptcy trustee to recover value of "avoided" transfers).

See All American Oilfield v. Cook Inlet Energy; Charles Gebhardt v. Carol Inman , Nos. S-16974/17043, at 2 (Alaska Supreme Court Order, Apr. 13, 2018). We also certified another question - similar to the first noted question - whether Inman has a dump lien over minerals in a natural reservoir. But Inman decided not to pursue this question.

Attorneys Liab. Prot. Soc'y, Inc., v. Ingaldson Fitzgerald, P.C. , 370 P.3d 1101, 1105 (Alaska 2016) (quoting Schiel v. Union Oil Co. of Cal. , 219 P.3d 1025, 1029 (Alaska 2009) ).

Id. (quoting Schiel , 219 P.3d at 1029 ).

"We interpret statutes 'according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose.' " Id . (quoting Municipality of Anchorage v. Stenseth , 361 P.3d 898, 905 (Alaska 2015) ). We have rejected a mechanical application of the plain-meaning rule and instead "use a sliding scale approach to statutory interpretation, in which 'the plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be.' " Id. (quoting Stenseth , 361 P.3d at 905 ).
Alaska's worker lien laws are remedial in nature and should be construed liberally. AS 34.35.930. But we have distinguished between the remedial portions of lien statutes and those " 'which articulate mandatory conditions precedent to the very creation and existence of the lien.' These mandatory conditions precedent ... are to be 'strictly construed.' " Lakloey, Inc. v. Ballek , 211 P.3d 662, 665-66 (Alaska 2009) (first quoting H.A.M.S. Co. v. Elec. Contractors of Alaska, Inc. , 563 P.2d 258, 262 (Alaska 1977) ; then quoting Nerox Power Sys., Inc. v. M-B Contracting Co. , 54 P.3d 791, 800 (Alaska 2002) ).

AS 34.35.135.

AS 34.35.140(a).

AS 34.35.170(a)(1).

AS 34.35.140(c).

Id .

See AS 34.35.140(a).

See Lakloey, Inc. v. Ballek , 211 P.3d 662, 665 (Alaska 2009) ; see also 53 Am. Jur. 2d Mechanics' Liens § 25 (2017) (internal citations omitted) (emphasis added):
[P]rior to the application of a liberal construction to the lien laws, the procedural requirements - such as those for attachment, creation, and perfection and dissolution of a mechanic's lien - are to be strictly construed against the party claiming the lien. Accordingly, in many jurisdictions, mechanic's lien statutes are strictly construed as to ... what constitutes labor and materials or lienable items [and] the kind of property or the estate or interest on which a lien may be fastened .

See AS 34.35.170(a)(1).

See id.

See AS 38.05.180(u) (providing Alaska Department of Natural Resources commissioner may authorize subsurface gas storage subject to lease).

AS 34.35.170(a)(3) (emphasis added).

Act of June 25, 1910, ch. 422, 36 Stat. 848 (creating miner's labor lien in Alaska territory).

Id. at § 1.

See id. at §§ 1-11.

45 Cong. Rec. 4,905 (1910).

Id.

Id. (emphasis added).

Id.

Id.

Id.

4 Alaska 642 (D. Alaska 1913).

Id. at 655.

See id.

5 Alaska 204 (D. Alaska 1914).

Id. at 209.

Ch. 79, SLA 1913.

Id. at § 1 (emphasis added).

Id.

Ch. 13, SLA 1915.

Id.

Id. at § 1.

Id. at § 13 (emphasis added).

Id. ; see Donaldson v. Henning , 4 Alaska 642, 655 (D. Alaska 1913) ; Nordstrom v. Sivertsen-Johnsen Mining & Dredging Co. , 5 Alaska 204, 209 (D. Alaska 1914).

Ch. 113, SLA 1933. The statute was renumbered in 1949 but substantively contained the same provisions. §§ 26-2-1 to 26-9-13 Alaska Compiled Laws Annotated (1949).

Ch. 113, SLA 1933.

Id. at § 1.

Id. The dump lien statute has been mentioned in four other cases. The "dump" definition was revisited in two of these cases. D.H. Blattner & Sons, Inc. v. N.M. Rothschild & Sons, Ltd. , 55 P.3d 37, 42-49 (Alaska 2002) (discussing dump lien statute's "work" definition but not analyzing whether dump or mass existed); Studdert v. Tanana Valley Gold Dredging Co. , 8 Alaska 267, 271 (D. Alaska 1931) (rejecting expansive reading of 1915 statute and stating legislature intended "to refer only to ... minerals which were either deposited in dumps or piles, placed in hoppers or tanks or in sluice boxes or bunkers, or other receptacles, located in the same place"). The statute was discussed only tangentially in the others. Morris v. Rowallan Alaska, Inc. , 121 P.3d 159, 161 n.4 (Alaska 2005) (explaining appellant filed dump lien to satisfy judgment); In re Naknek Elec. Ass'n , 471 B.R. 225, 236-37 (Bankr. D. Alaska 2012) (discussing AS 34.35.140 relating to "work" definition used in mine lien statute).

Gillis v. Aleutians E. Borough , 258 P.3d 118, 124 (Alaska 2011) (alteration in original) (quoting Sherbahn v. Kerkove , 987 P.2d 195, 201 (Alaska 1999) ).

Sherman v. Holiday Const. Co. , 435 P.2d 16, 19 (Alaska 1967).

See Gillis , 258 P.3d at 124.

The State cites Robert F. Walters, Gorham Oil Field, Russell County, Kansas , Kan. Geological Surv. (1991) and Daniel Johnson, Gasometers: a brief history , The Telegraph (Nov. 26, 2013), which, according to the State, "indicate that around 1933, extracted crude oil was sometimes temporarily kept in pools or tanks near a well that could constitute a 'dump' or 'mass,' and technology did exist that would allow gas to be kept in tanks called 'gasholders' in some situations." The State also discusses a 1934 Kentucky Court of Appeals case, Hammonds v. Cent. Ky. Nat. Gas Co. , 255 Ky. 685, 75 S.W.2d 204 (1934), overruled on other grounds by Tex. Am. Energy Corp. v. Citizens Fid. Bank & Tr. Co. , 736 S.W.2d 25 (Ky. 1987), which suggested that "produced gas could be injected into depleted reservoirs for storage." Cook Inlet cites an Indiana historical source, Robert V. Kirch, Development of Underground Gas Storage in Indiana , 54 Ind. Mag. of Hist. 3 (1958), noting underground gas storage in Indiana began as early as 1916.

See Louise Jordan, Natural Gas Storage in Oklahoma , 19 Okla. Geology Notes , 183, 183 (1959).

All American also contends that the statute should be read to "maximize the economic recovery Alaska obtains with respect to the extraction of its natural resources." All American claims that requiring gas to be extracted would result in "outside lenders ... obtain[ing] decades of benefits" to the detriment of local economies. Evaluating the merits of this economic policy argument is a task better left to the legislature.

D.H. Blattner & Sons, Inc. v. N.M. Rothschild & Sons, Ltd. , 55 P.3d 37, 44 (Alaska 2002).

Id.

See AS 34.35.170(a)(1).

Id.

See AS 34.35.170(a)(3).

Id.

See AS 34.35.170(a)(1).

See AS 34.35.170(a)(3).

See AS 34.35.170(a)(1).

See AS 34.35.170(a)(3).

AS 34.35.170(a)(1).

See AS 34.35.170(a)(3).

38 Am. Jur. 2d Gas and Oil § 4 (2017) ("Gas and oil when unsevered are a part of the land and after gas and oil are extracted from the soil and brought to the surface, they are deemed personal property." (Internal citations omitted)); see Cont'l Res. of Ill., Inc. v. Ill. Methane, LLC , 364 Ill.App.3d 691, 301 Ill.Dec. 887, 847 N.E.2d 897, 901 (2006) ("Oil and gas in place are minerals, but because of their fugacious qualities, they are incapable of ownership distinct from the soil. ... Oil and gas are incapable of ownership until actually found and produced.").

AS 34.35.170(a)(1).

See 8 Alaska 267, 271 (D. Alaska 1931) ("Clearly, in my judgment, the Legislature intended, by the use of this language, to refer only to sands, earth, ore, rock, and minerals which were either deposited in dumps or piles, placed in hoppers or tanks or in sluice boxes or bunkers, or other receptacles, located in the same place." (Emphasis added)).

See Whether , 10 A New English Dictionary on Historical Principles 36 (C.T. Onions ed. 1928) ("Introducing a disjunctive clause (usually with correlative or ) having a qualifying or conditional force, and standing in adverbial relation to the main sentence." (Emphasis in original)); Whether , 10 The Century Dictionary & Cyclopedia 6895 (Benjamin E. Smith ed. 1914) ("Introducing the first of two (or more) alternatives, the second being introduced by or ." (Emphasis in original)).

See AS 34.35.170(a)(1).

Receptacle , 8 The Century Dictionary & Cyclopedia 4998(Benjamin E. Smith ed. 1914); see also Receptacle , 2 Funk & Wagnalls New Practical Standard Dictionary Of The English Language 1093 (Charles Earle Funk ed. 1954) ("Anything that serves to contain or hold other things").

City of Kenai v. Friends of Recreation Ctr., Inc. , 129 P.3d 452, 459 (Alaska 2006) (quoting West v. Umialik Ins. Co. , 8 P.3d 1135, 1141 (Alaska 2000) ).

See Reservoir , Paul W. Thrush, A Dictionary of Mining, Mineral, & Related Terms 914 (1968), available at https://files.eric.ed.gov/fulltext/ED059035.pdf ("A natural underground container of liquids, such as oil or water, and gases."); Reservoir , 8 The Century Dictionary & Cyclopedia 5101 (Benjamin E. Smith ed. 1914) ("A place where anything is kept in store: usually applied to a large receptacle for fluids or liquids, as gases or oils."); Tank , A Dictionary of Mining, Mineral, & Related Terms 1119 (1968), https://files.eric.ed.gov/fulltext/ED059035.pdf ("A large vessel or receptacle, made either of wood or of metal, intended to contain a fluid as gas or water."); Tank , 9 The Century Dictionary & Cyclopedia 6180 (Benjamin E. Smith ed. 1914) ("A large vessel or structure of wood or metal designed to hold water, oil, or other liquid, or a gas.").

See Bunker , A Dictionary of Mining, Mineral, & Related Terms 151 (1968), available at https://files.eric.ed.gov/fulltext/ED059035.pdf ("A vessel for the storage of materials; the lowermost portion is usually constructed in the form of a hopper. Also called bin."); Bunker , 1 The Century Dictionary & Cyclopedia 721 (Benjamin E. Smith ed. 1914) ("A sort of fixed chest or box; a large bin or receptacle: as, a coal-bunker ." (Emphasis in original.)).

See Hopper , A Dictionary of Mining, Mineral, & Related Terms 550 (1968), available at https://files.eric.ed.gov/fulltext/ED059035.pdf (providing third definition of "hopper" as "[a] storage bin or a funnel that is loaded from the top and discharges through a door or chute at the bottom").

See Hopper , A Dictionary of Mining, Mineral, & Related Terms 550 (1968), https://files.eric.ed.gov/fulltext/ED059035.pdf (providing first definition of "hopper" as "[a] vessel into which materials are fed, usually constructed in the form of an inverted pyramid or cone terminating in an opening through which the materials are discharged (not primarily intended for storage )" (emphasis added)); Hopper , 1 Funk & Wagnalls New Practical Standard Dictionary Of The English Language 640 (Charles Earle Funk ed. 1948) ("A tank or box-like receptacle for holding water, grain, sugar, etc., which may be emptied by opening its bottom.").

See Sluiceboxes , A Dictionary of Mining, Mineral, & Related Terms 1031 (1968), https://files.eric.ed.gov/fulltext/ED059035.pdf ("Long, inclined troughs or launders containing riffles in the bottom that provide a lodging place for heavy minerals in ore concentration."); Sluice , 9 The Century Dictionary & Cyclopedia 5707 (Benjamin E. Smith ed. 1914) ("In mining , a trough made of boards, used for separating gold from the gravel and sand in which it occurs." (Emphasis in original.)).

See Pipeline , A Dictionary of Mining, Mineral, & Related Terms 824 (1968), https://files.eric.ed.gov/fulltext/ED059035.pdf ("A line of pipe with pumping machinery and apparatus for conveying a liquid or gas."); Pipe-line , 2 Funk & Wagnalls New Practical Standard Dictionary Of The English Language 999 (Charles Earle Funk ed. 1954) ("A line of pipe, as for transmission of water, oil, etc.").

See M.A.B. Ernst et. al, Line-Pack Management For Producing Electric Power On Peak Periods , 31 Applied Thermal Engineering 42, 42-43 (2011) ("Line-pack is the storing of natural gas inside the pipeline network by boosting the line pressure above the delivery pressure. The line-pack is useful to reduce abrupt changes on compressor load.").

See Transw. Pipeline Co. v. United States , 639 F.2d 679, 680-81 (Ct. Cl. 1980) ("The line pack gas in issue, in the sense of a constant volume of gas, but not in the sense of specific molecules of gas, is an indispensable and, in substance, an integral part of the pipeline system, just as the pipe in the pipeline, or the compressors or any other essential component without which the pipeline system cannot operate.").

E. Shashi Menon, Gas Pipeline Hydraulics 132-35 (2005) (providing equations to calculate line-pack volume based on pipe diameter, length, gas pressure, temperature, and compressibility).

See AS 34.35.170(a)(1).

Assuming that gas in a pipeline could qualify as a dump, both All American and Inman argue that a corresponding dump lien should extend to all gas pumped though the pipeline, not just the gas that exists at a particular point in time. Gebhardt argues, on the other hand, that a dump lien would attach only to gas present at a fixed point in time, and his counsel noted at oral argument before us that the legal implications of foreclosure law compel that conclusion. Acknowledging these arguments, we do not address their merits because they are beyond the scope of the question certified to us.

Cf. D.H. Blattner & Sons, Inc. v. N.M. Rothschild & Sons, Ltd. , 55 P.3d 37, 54 (Alaska 2002) ("The determination of whether 'adjacent' or 'nearby' activities can be considered part of the project must be made on a case-by-case basis and take into account 'whether the activity could have been carried out at an alternative site closer' to the project." (quoting Bd. of Trade, Inc. v. State, Dep't of Labor, Wage & Hour Admin. , 968 P.2d 86, 92 (Alaska 1998) )).

No. 4FA-98-1749 CI, at 11 (Alaska Super., Nov. 30, 1999).

D.H. Blattner & Sons, Inc. , 55 P.3d at 42.

See Blattner , No. 4FA-98-1749 CI, at 13.

See Production , 2 Funk & Wagnalls New Practical Standard Dictionary Of The English Language 1045 (Charles Earle Funk ed. 1954) (defining "production" as "[t]he act or process of producing" or "[t]hat which is produced or made").